**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>RANI EL-SAADI, STEVAN HILL<br><br>*Defendants*. | Criminal Action No. 19-374 (RDM) |

<u>**MEMORANDUM OPINION AND ORDER**</u>

In this case, the government alleges two conspiracies involving eight defendants illegally to funnel nearly $5 million into the 2016 presidential election.  Pending before the Court are motions from two of the defendants, Rani El-Saadi and Stevan Hill, to dismiss some of the charges against them.  Dkt. 83; Dkt. 106.  El-Saadi and Hill are each accused of making conduit contributions at the behest of defendant Ahmad Khawaja in violation of 52 U.S.C. § 30122.  Specifically, to avoid exceeding the cap on the amount that he was individually permitted to contribute under federal law, Khawaja allegedly gave money to El-Saadi and Hill, who then donated that money using their own names to political committees associated with 2016 presidential candidates.  El-Saadi and Hill seek the dismissal of the conduit contribution charges against them on the ground that venue in this District is improper because their alleged crimes did not occur in the District of Columbia.  El-Saadi also seeks severance of his trial from that of his co-defendants.  He argues that, because he played only a small role in one conspiracy, he will be prejudiced at trial by the disparity between the relatively small amount of evidence implicating him in that conspiracy and the relatively large amount of evidence against his co-defendants.  For the following reasons, the Court will **DENY** the motions.

# I.  BACKGROUND

**A.**     **Statutory and Regulatory Background**

In 1971, Congress enacted the Federal Election Campaign Act ("FECA"), 52 U.S.C.

§ 30101 *et seq.*, to "remedy any actual or perceived corruption of the political process."  *FEC v.*

*Akins*, 524 U.S. 11, 14 (1998).  In pursuit of that goal, FECA imposes disclosure and reporting

requirements on candidates for public office and their campaign committees, including by

requiring the identification of individual donors who contribute more than $200.  52 U.S.C.

§ 30104(b)(3)(a).  As amended, FECA also imposes limits on the amounts that individuals and

organizations may contribute to a candidate for federal office and the candidate's campaign

committees.  *Id.* § 30116(a).  And the statute prohibits foreign nationals from making

contributions "in connection with a [f]ederal, [s]tate, or local election."  *Id.* § 30121(a)(1)(A).

To prevent circumvention of these requirements, FECA provides that "[n]o person shall make a

contribution in the name of another person or knowingly permit his name to be used to effect

such a contribution, and no person shall knowingly accept a contribution made by one person in

the name of another person."  *Id.* § 30122.

Some of the alleged conduit contributions in this case were made to joint fundraising

committees.  FECA permits candidates and political committees to engage in joint fundraising

through committees "established solely for the purpose of joint fundraising."  52 U.S.C.

§ 30102(e)(3)(A)(ii).  Under governing Federal Election Commission regulations, participants in

such a joint fundraising effort must "either establish a separate committee or select a

participating committee[] to act as fundraising representative for all participants."  11 C.F.R.

§ 102.17(a)(1)(i).  The regulations impose various procedural requirements on joint fundraising

efforts.  The participating committees must enter into a written agreement that "state[s] a formula

for the allocation of fundraising proceeds." *Id.* § 102.17(c)(1).  The contribution limit for a party donating to a joint fundraising committee is the sum of the limits for all participating committees.  *Id.* § 102.17(c)(5).  In soliciting contributions, the joint fundraising committee must provide a notice that includes "[t]he names of all committees participating in the joint fundraising activity" and "[t]he allocation formula to be used for distributing joint fundraising proceeds." *Id.* § 102.17(c)(2)(i).  The participants or the fundraising representative must "establish a separate depository account to be used solely for the receipt and disbursement of the joint fundraising proceeds," and each participant must "amend its Statement of Organization to reflect the account as an additional depository." *Id.* § 102.17(c)(3)(i).  The fundraising representative allocates gross proceeds according to the predetermined formula, allocates fundraising expenses, and then distributes the net proceeds to the participants.  *Id.* § 102.17(c)(6)–(7).  "For contribution reporting and limitation purposes, the date of receipt of a contribution by a participating political committee is the date that the contribution is received by the fundraising representative." *Id.* § 102.17(c)(3)(iii).

"All contributions deposited" by a joint fundraising committee "must be permissible under" FECA.  *Id.* § 102.17(c)(3)(i).  "The fundraising representative *and* participating committees [must] screen all contributions received to insure that the prohibitions and limitations [in FECA and its implementing regulations] are observed," including the prohibition on conduit contributions.  *Id.* § 102.17(c)(4)(i) (emphasis added); *see also id.* § 110.4(b).  With respect to reporting requirements, both the fundraising representative *and* the participating political committee must report contributions to the joint fundraising effort.  *Id.* § 102.17(c)(8)(i).  "After distribution of net proceeds, each participating political committee shall report its share of net proceeds received as a transfer-in from the fundraising representative." *Id.* § 102.17(c)(8)(i)(B).

B.      **Factual and Procedural Background**

In this case, the government brings a 64-page, 53-count indictment against eight defendants alleging two conspiracies to make excessive and conduit contributions in violation of FECA during the 2016 presidential campaign.  The indictment alleges that, in the first conspiracy, defendant George Nader funneled $4.9 million in foreign funds to Khawaja (and Khawaja's company), who then made more than $3.5 million in unlawful conduit contributions to four political committees, including the fundraising committees of a 2016 presidential candidate.[1]  Dkt. 1 at 6–7 (Indictment ¶¶ 28a–28e).  Nader and Khawaja allegedly hoped that these contributions would grant them access to and influence with this presidential candidate, which they could then parlay to gain favor with and financial support from the government of a foreign country.  *Id.* at 5–6 (Indictment ¶¶ 24–25).  The indictment does not allege that El-Saadi or Hill participated in that first conspiracy.

Count 13 of the indictment charges a second conspiracy in which Khawaja allegedly made excessive contributions to several political committees, with six of his associates, including El-Saadi and Hill, acting as conduits.  *Id.* at 27–28 (Indictment ¶¶ 53a–53c).  In all, Khawaja allegedly funneled more than $1.8 million to his co-conspirators for the purpose of making conduit contributions, again in the hopes of gaining political influence.  *Id.* at 29 (Indictment ¶¶ 54, 57a).  In particular, in September 2016, Khawaja arranged to host a private fundraiser for a presidential candidate in Las Vegas, Nevada, which required him to contribute or to raise $500,000 for that candidate's political committees.  *Id.* at 30 (Indictment ¶ 58a).  Because

---

[1]  The indictment does not reveal the identities of the presidential candidates and political committees involved, referring to them as, *e.g.*, Candidate 1 or Political Committee 5.  Likewise, Khawaja's business is referenced as Company A.  The Court adopts the same naming conventions in this opinion.

Khawaja could not contribute that amount himself without exceeding contribution limits, he allegedly provided funds to his co-conspirators to contribute in their names.  *Id.* at 30–31 (Indictment ¶ 58a).  As relevant here, on or about August 6, 2016, Khawaja allegedly gave Hill a check for $30,000, and on or about August 18, 2016, Khawaja allegedly gave Hill another check for an additional $75,000.  *Id.* at 31 (Indictment ¶ 58c).  On or about August 28, 2016, Hill allegedly sent a $100,000 check to a joint fundraising committee that the indictment refers to as Political Committee 2.  *Id.*  Although Hill made this donation in his own name, the indictment alleges that he did so "with monies funneled to him by KHAWAJA for the purpose of making the contribution and to avoid and exceed the personal contribution limits set by federal law."  *Id.*  Likewise, Khawaja's company allegedly gave $148,965 to El-Saadi's company on September 9, 2016, in connection with the Las Vegas fundraiser.  *Id.* at 33 (Indictment ¶ 58g).  On or about the same day, El-Saadi transferred $150,000 from his company's account to his personal account and then wrote a personal check for $150,000 to Political Committee 2.  *Id.*  Although El-Saadi made this donation in his own name, the indictment alleges that he did so "with monies funneled to him by KHAWAJA for the purpose of making the contribution and to avoid and exceed the personal contribution limits set by federal law."  *Id.*

Although El-Saadi is accused of making only that single conduit contribution, the indictment alleges that Hill later made two additional conduit contributions as well.  On or about June 16, 2017, Hill wrote a check for $50,000 to Political Committee 6, and on or about June 19, 2017, Khawaja sent $60,000 to Hill.  *Id.* at 35 (Indictment ¶ 58m).  Similarly, on or about January 19, 2018, Khawaja gave Hill $50,000, and on or about January 28, 2018, Hill wrote a $50,000 check to Political Committee 7 in connection with a private fundraiser for an elected official that Khawaja hosted at his home.  *Id.* at 36–37 (Indictment ¶ 58q).  The indictment

alleges that, although Hill made these contributions in his own name, they were both conduit contributions made on behalf of Khawaja, in order to allow Khawaja to exceed contribution limits.  *Id.*

El-Saadi and Hill face not only the conspiracy charge in Count 13, but also substantive charges for making conduit contributions.  Specifically, the indictment charges El-Saadi in Count 18 with permitting his name to be used to effect (and aiding and abetting Khawaja in making) conduit contributions to Political Committee 2 and Political Committee 5, *id.* at 40–41 (Indictment ¶¶ 67–68); Hill in Count 19 with permitting his name to be used to effect (and aiding and abetting Khawaja in making) conduit contributions to Political Committee 2 and Political Committee 5, *id.* at 41 (Indictment ¶¶ 69–70); Hill in Count 27 with permitting his name to be used to effect (and aiding and abetting Khawaja in making) conduit contributions to Political Committee 6, *id.* at 46 (Indictment ¶¶ 85–86); and Hill in Count 41 with permitting his name to be used to effect (and aiding and abetting Khawaja in making) conduit contributions to Political Committee 7, *id.* at 55 (Indictment ¶¶ 113–14).  The indictment alleges that El-Saadi and Hill committed each of these crimes "in the District of Columbia and elsewhere."  *Id.* at 40–41, 46, 55 (Indictment ¶¶ 68,70, 86, 114).

El-Saadi moves to dismiss the conduit contribution charge in Count 18—but not the conspiracy charge in Count 13—on the ground that venue is improper in the District of Columbia.  Dkt. 83; *see also* Dkt. 93.  He also asks the Court to sever his trial on the remaining conspiracy charge from the trial of his co-defendants.  Dkt. 83.  The government opposes the motion.  Dkt. 92.  The Court heard argument on the motion on December 7, 2020.  *See* Minute

Entry (Dec. 7, 2020); Dkt. 122.  Following that hearing, Hill moved to dismiss Counts 19,[2] 27,

and 41.  Dkt. 106.  In support of the motion, Hill does not present any additional arguments of

his own but simply adopts the arguments that El-Saadi made in his motion.  Dkt. 107.  The

government opposes Hill's motion as well.  Dkt. 111.  On June 15, 2021, the Court held an

additional hearing on the motions and sought additional briefing from the parties on the question

of how Political Committee 2's status as a joint fundraising committee might affect the venue

analysis.  *See* Minute Entry (June 15, 2021); Dkt. 121.  The parties have filed their supplemental

briefs, Dkt. 123; Dkt. 124, and the motions are now ripe for decision.

## II.  ANALYSIS

### A.    Motions to Dismiss for Lack of Venue

El-Saadi (and, by extension, Hill) argues that the conduit contribution charge must be

dismissed for improper venue.  "Proper venue in criminal proceedings was a matter of concern to

the Nation's founders," who protested in the Declaration of Independence that King George III

"transport[ed] colonists 'beyond Seas to be tried.'"  *United States v. Cabrales*, 524 U.S. 1, 6

(1998) (quoting The Declaration of Independence, para. 21 (1776)).  To put an end to such

practices, the Constitution protects criminal defendants' venue rights not once but twice.  U.S.

Const. art. III, § 2, cl. 3 provides that "Trial of all Crimes . . . shall be held in the State where the

said Crimes shall have been committed," and the Sixth Amendment guarantees a trial "by an

impartial jury of the State and district wherein the crime shall have been committed."[3]  Mirroring

---

[2]  Hill's motion actually seeks dismissal of Count 17, but since Hill is not charged in Count 17, the Court will construe the motion as seeking to dismiss Count 19, in which Hill is charged.

[3]  Although the language of the Sixth Amendment, when read literally, "specifies the place where the jurors are to be selected rather than the place of trial," courts have "never" given that distinction "any weight," because "the requirement that the jury be chosen from the state and district where the crime was committed presupposes that the jury will sit where it is chosen,"

that constitutional language, Rule 18 of the Federal Rules of Criminal Procedure dictates that "the government must prosecute an offense in a district where the offense was committed." Fed. R. Crim. P. 18. In a criminal trial, considerations of venue are not merely procedural but rather "raise deep issues of public policy." *United States v. Johnson*, 323 U.S. 273, 276 (1944).

To determine whether venue is proper, the Court looks to "the *locus delicti*" (that is, the scene of the crime), which "must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *United States v. Morgan*, 393 F.3d 192, 196 (D.C. Cir. 2004) (quotation marks and citation omitted). The Court "must initially identify the conduct constituting the offense (the nature of the crime) and then discern the location of the commission of the criminal acts." *Id.* (quotation marks and citation omitted). "Venue may be proper in more than one district," *United States v. Lam Kwong-Wah*, 924 F.2d 298, 301 (D.C. Cir. 1991) (citation omitted), so long as "the acts constituting the crime and the nature of the crime charged implicate more than one location." *United States v. Lange*, 834 F.3d 58, 68 (2d Cir. 2016) (quotation marks and citation omitted). For such "continuing offenses," venue is proper where the offense "was begun, continued, or completed." 18 U.S.C. § 3237(a); *see also United States v. Chin*, 981 F.2d 1275, 1278 (D.C. Cir. 1992) ("It is well established that continuing offenses may be prosecuted in any district in which they 'continued.'"). At trial, "[t]he government bears the burden of establishing by a preponderance of the evidence that venue is proper with respect to each count charged against a defendant." *Lam Kwong-Wah*, 924 F.2d at 301 (citation omitted).[4]

---

rather than the defendant being hauled across the sea with the jury in tow. *United States v. Morgan*, 393 F.3d 192, 195 (D.C. Cir. 2004) (quotation marks and citation omitted).

[4] Caselaw in this Circuit makes clear that "[v]enue is an issue that normally must be submitted to the jury" and that the government must prove venue by a preponderance of the evidence. *Lam*

El-Saadi argues that venue is improper in the District of Columbia for the conduit contribution charge in Count 18 because he lives and works in Los Angeles and the fundraiser he allegedly attended was in New Mexico.  He argues that the proper venue for a conduit contribution charge under 52 U.S.C. § 30122 is "where the contribution was made."  Dkt. 83-1 at 13.  And he asserts that "[n]owhere does the [i]ndictment . . . suggest that [El-Saadi] made a contribution while in Washington, D.C., or that he had ever traveled to the District during the relevant time frame."  *Id.* at 13–14.  In a footnote, El-Saadi also expresses confusion as to why he was charged with making conduit contributions to both Political Committee 2 and Political Committee 5, since the narrative allegations in the indictment describe only a contribution to Political Committee 2.  *Id.* at 10–11 n.4.

The government disagrees on both the law and the facts.  The government argues, first, that a conduit contribution charge "is properly venued wherever the campaign contribution was sent, received, or accepted."  Dkt. 92 at 2.  The government contends that El-Saadi made a contribution to Political Committee 2, which was a joint fundraising committee that included

---

*Kwong-Wah*, 924 F.2d at 301.  It is less clear what standard governs a pretrial motion to dismiss on venue grounds in a criminal case or whether the Court must resolve such a motion based on the face of the indictment or may also consult other evidence.  Federal Rule of Criminal Procedure 12 provides that a motion asserting improper venue must be raised before trial where "the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits."  Fed. R. Crim. P. 12(b)(3).  That language seems to contemplate that the Court may consider evidence beyond the face of the indictment where such evidence is "reasonably available."  *Id.*  In his motion, El-Saadi points to both the allegations in the indictment and "the discovery produced by the government."  Dkt. 83-1 at 13.  And decisions in this District resolving pretrial motions to dismiss for improper venue in criminal cases routinely rely on allegations outside the four corners of the indictment.  *See, e.g.*, *United States v. Han*, 280 F. Supp. 3d 144, 149–52 (D.D.C. 2017); *United States v. Gamble*, No. 19-cr-348, 2020 WL 3605829, at *3–5 (D.D.C. July 2, 2020).  The Court thus concludes that it should grant Defendants' motions to dismiss only if the "reasonably available" evidence shows that the government could not prove by a preponderance of the evidence that the charged offenses occurred in the District of Columbia.

Political Committee 5.  *Id.* at 3.  El-Saadi's contribution to Political Committee 2 thus resulted in

more than $33,000 passing to Political Committee 5.  And Political Committee 5 was located in

the District of Columbia.[5]  *Id.*  Accordingly, the government argues that venue is proper in the

District of Columbia because "Political Committee 5 accepted, received for its benefit, and

reported El-Saadi's contribution in Washington, D.C."  *Id.*

In reply, El Saadi makes an alternative argument.  He contends that, even if venue is

proper not only where the contribution was made, but also where the contribution was accepted,

venue is still improper in the District of Columbia because "the government has effectively

conceded that the alleged contribution in Count 18 was accepted and deposited by Political

Committee 2 before funds could be transferred to Political Committee 5" in the District of

Columbia.  Dkt. 93 at 9.  According to El-Saadi, "the illegal contribution was complete, at latest,

when Political Committee 2 deposited the check, not when funds were subsequently transferred."

*Id.*

To determine whether venue is proper in the District of Columbia for the conduit

contribution charge, the Court "must initially identify the conduct constituting the offense" of

making a conduit contribution "and then [must] discern the location of the commission of the

criminal acts."  *Morgan*, 393 F.3d at 196 (quotation marks and citation omitted).  The parties cite

---

[5]  The indictment does not specify where Political Committee 5 is located, but El-Saadi does not
contest, as a factual matter, that it is based in Washington, D.C., nor does he argue that the
indictment is deficient for omitting that detail.  See Dkt. 93 at 5; *cf. United States v. Verrusio*,
762 F.3d 1, 13 (D.C. Cir. 2014) ("[T]he validity of an indictment is not a question of whether it
could have been more definite and certain." (quotation marks and citation omitted)).  Further,
because Hill joined El-Saadi's motion without submitting briefing of his own, he has not called
into question the government's assertions that Political Committee 6 and Political Committee 7
are physically located in the District of Columbia.  Dkt. 111 at 5–6.

to three out-of-circuit cases that address the questions of what conduct is required to make a conduit contribution and, by extension, at which point in the process of making a conduit contribution the crime has been completed. Although helpful to the Court's consideration, those cases do not clearly answer the question presented here.

The government relies primarily on the Second Circuit's decision in *United States v. Chestnut*, 533 F.2d 40 (2d Cir. 1975). In *Chestnut*, the Second Circuit held that the crime of "receiving and accepting of an unlawful contribution" occurs at the place of deposit, because "the deposit of the checks . . . constitute[s] the ultimate essential element of the offense of accepting and receiving an unlawful contribution." *Id.* at 47. The government thus contends that El Saadi's conduit contribution occurred, in part, in the District of Columbia because Political Committee 5 deposited its portion of his check in the District. The obvious problem with the government's reliance on *Chestnut* is that El-Saadi is not charged with "the offense of accepting and receiving an unlawful contribution." *Id.*

The conduit contribution statute delineates the elements of three separate offenses: (1) "mak[ing] a conduit contribution in the name of another person;" (2) "knowingly permit[ting] [one's] name to be used to effect such a contribution;" and (3) "knowingly accept[ing] a contribution made by one person in the name of another." 52 U.S.C. § 30122. The defendant in *Chestnut* was charged with the third type of offense, which clearly requires receipt of the contribution. Here, however, El-Saadi is charged with aiding and abetting the first type of offense and with himself committing the second type of offense. The first two types of offenses may or may not require the political committee to receive or deposit the funds before the crime is completed, but *Chestnut* does not answer—or even address—that question. Instead, *Chestnut* focuses exclusively on the third type of offense, which is not charged here.

11

The government responds that *Chestnut* is relevant to this case because the indictment alleges that El-Saadi and Hill "willfully caused the [political committees] to unwittingly accept contributions made by one person in the name of another person."  Dkt. 1 at 41 (Indictment ¶¶ 68, 70).  But because the acceptance of the contributions was "unwitting," the indictment does not allege that the political committees committed—or that El-Saadi aided and abetted—the third type of offense under the statute, which requires "knowing[] accept[ance]."  52 U.S.C. § 30122. *Chestnut* thus dealt with a different type of offense than the one charged here, and the government's reliance on *Chestnut* is unavailing.

For his part, El-Saadi relies on a pair of cases from the Third Circuit that addressed the elements of making a conduit contribution: *United States v. Hankin*, 607 F.2d 611 (3d Cir. 1979), and *United States v. Passodelis*, 615 F.2d 975 (3d Cir. 1980).  In *Hankin*, a defendant challenged his conviction for making conduit contributions on statute of limitations grounds.  607 F.2d at 612.  The record indicated that the defendant had sent, and the campaign had received, the conduit contribution outside the limitations period, but that the campaign's depositing of the check fell within the limitations period.  *Id.* at 613.  Accordingly, Hankin's conviction could be sustained only if the depositing of the check was part of the conduct constituting the crime.  The Third Circuit held that the crime was completed and the statute of limitations thus began to run "when the contributions were made," which was "prior to the day of the . . . deposit."  *Id.* at 615. But the court left open the question of "whether the crime was completed on the date of mailing or on the date of receipt."  *Id.*

The Third Circuit concluded that the conduit contribution was complete prior to deposit for several reasons.  First, it explained that in other areas of the law, including contract and tax cases, courts deem payments completed either on mailing or (more frequently) on delivery,

without requiring a deposit.  *Id.* at 613–14.  The court also placed substantial weight on FECA's definition of "contribution."  *Id.* at 614.  At the time, FECA defined a contribution, in part, as "a written contract, promise or agreement, whether or not legally enforceable, to make a contribution."  *Id.* (citing 2 U.S.C. § 431(e)(2) (1976)).  The Third Circuit reasoned that, if a contribution need not be legally enforceable to qualify under the statute, then the crime was completed before the campaign committee deposited the funds.  *Id.*

The Third Circuit's analysis in *Hankin* is unhelpful for resolving the present dispute for several reasons.  First and most importantly, as the government points out in its supplemental brief, Dkt. 124 at 6, the defendant in *Hankin* had been charged only with *making* conduit contributions in the names of four other people, 607 F.3d at 612.  As the principal in the conduit contribution scheme, the defendant was not charged with "knowingly permit[ting] [his] name to be used to effect such a contribution."  52 U.S.C. § 30122.  The Court concludes that the conduct constituting the offense of "making" a contribution may differ from the conduct necessary to "effect" a contribution, as is alleged in this case.

The Court is unpersuaded by other aspects of the analysis in *Hankin* as well.  In the more than forty years since *Hankin* was decided, Congress has amended FECA several times, including by amending the definition of "contribution."  In its current form, the statutory definition no longer includes any of the language on which the *Hankin* court relied.  *See* 52 U.S.C. § 30101(8)(A)(i).  That is, the current definition no longer explicitly encompasses legally unenforceable or promised future contributions.  *Id.*  These changes to the statutory text cast considerable doubt on the continuing validity of the Third Circuit's reasoning in *Hankin*.  Nor is the Court convinced by the suggestion that Congress may have intended for the crime of making a conduit contribution to be complete upon the sending of the contribution because "another

provision punishes the receipt of illegal contributions." *Hankin*, 607 F.2d at 615.  The primary distinction between the crime of making a conduit contribution and the crime of willfully accepting a conduit contribution is the identity of the actor, rather than the stage of the donation process.  Nothing about the statutory text would seem to foreclose the possibility that a donor could commit the crime of making a conduit contribution and a campaign could commit the crime of willfully accepting a conduit contribution at the exact same time—perhaps upon receipt of the donation or maybe upon deposit.

Finally, the government argued in *Hankin* that a conduit contribution is not complete until deposit because, before then, it remains uncertain whether the political committee will accept the gift.  In the Third Circuit's view, however, because the committee could have theoretically rejected the contribution even after deposit, "the contribution was no more irrevocable on the date of deposit than on the date of mailing, the date of receipt, or two weeks after the date of deposit." *Id.* at 614.  But nothing in FECA suggests that a person could be convicted of making a conduit contribution if his check were lost in the mail and never received by the political committee.  On the contrary, the statute's current definition of "contribution," with its reference to a "deposit," might fairly be read to suggest that the contribution remains incomplete at the time of sending.  Indeed, at oral argument, El-Saadi's counsel seemed to concede that a check lost in the mail or rejected immediately upon delivery would likely constitute an attempted conduit contribution, rather than a completed one.  Dkt. 122 at 29–30.  Here again, the Court finds the reasoning of *Hankin* less than conclusive on the questions presented in this case.

Four months later, the Third Circuit, relying on the reasoning of *Hankin*, overturned a conviction for making excessive contributions on venue grounds in *Passodelis*, 615 F.2d at 979.

The Third Circuit began its analysis by "ascertain[ing] the definitions of the crimes." *Id.* at 977.
To that end, the court observed that "the primary operative element" of making an excessive
contribution is the same as that of making a conduit contribution: "the making of a contribution."
*Id.* Given this similarity, the Court concluded that it was "bound by the holding in *Hankin* that
the illegal making of a contribution is complete before the contribution is deposited by the
recipient." *Id.* Applying that rule, the Third Circuit held that venue had been improper in the
Middle District of Pennsylvania. *Id.* at 977–78. Although the testimony at trial was unclear, the
record indicated that the defendant in the case may have handed off his excessive contribution in
the Western District of Pennsylvania to one Seymore Heyison, who in turn delivered the checks
to the campaign in the Middle District. *Id.* at 978. According to the Third Circuit, "it would
appear that if Heyison received the checks in the Western District from Passodelis, he did so in
his capacity as an agent" for the campaign in question. *Id.* As such, "[i]f Heyison received the
checks in the Western District, the crimes were complete in the Western District." *Id.* On that
basis, the court concluded that the government had failed to carry its burden of showing that
venue was proper in the Middle District.

As an initial matter, the Court is uncertain that the Third Circuit was correct to assume
that the conduct required to complete an excessive contribution is always equivalent to the
conduct required to complete a conduit contribution. But even granting that the same analysis
should apply to both types of offenses, the court in *Passodelis* simply adopted the reasoning of
*Hankin* about when a contribution is completed, and thus *Passodelis* is no more persuasive than
*Hankin* on that issue. Most significantly, *Passodelis*, like *Hankin*, dealt with the crime of *making*
a contribution (whether conduit or excessive), rather than of *effecting* one—an important
difference in the operative verbs. *See Chestnut*, 533 F.2d at 46–47 ("One helpful technique" for

determining "the nature of the offense and the location of the acts constituting it" is to "study the key verbs which define the criminal offense in the statute.").

Without definitive guidance from the limited caselaw, the Court turns to the text of the statute to determine what conduct constitutes an unlawful conduit contribution. As relevant here, a person violates the conduit contribution prohibition if he "make[s] a contribution in the name of another person or knowingly permits his name to be used to effect such a contribution." 52 U.S.C. § 30122. El-Saadi and Hill are charged with allowing their names to be used to effect conduit contributions and with aiding and abetting Khawaja in the making of conduit contributions. The operative question, then, is what it means to "make a contribution" or to "effect such a contribution" and, more to the point, when the act of making or effecting a contribution is completed. *Id.* For the following reasons, the Court concludes that the offense of knowingly permitting one's name to be used to "effect" a conduit contribution encompasses both the receipt and the acceptance (as opposed to rejection) of the contribution. As such, venue lies wherever the contribution was sent, received, or accepted.

First, the Court considers whether the offenses of making or effecting a conduit contribution encompass the political committee's receipt of that contribution. El-Saadi argues that venue lies only where the contribution was "made," by which he appears to mean the location from which the contribution was sent, rather than where it was received (at least in cases where those locations are different). *See* Dkt. 123 at 3 (distinguishing between where a contribution is "made" and where it is "received"); Dkt. 93 at 7. FECA's current definition of "contribution" forecloses El-Saadi's argument. As the Third Circuit noted in *Hankin*, FECA originally defined "contribution" to include not only "a gift, subscription, loan, advance, or deposit of money, or anything of value" but also "a contract, promise, or agreement, express or

implied, whether or not legally enforceable, to make a contribution."  Federal Election Campaign Act of 1971, Pub. L. No. 92-225, Title II, § 201, 86 Stat. 3, 8 (1972).  In the 1979 amendments to FECA, however, Congress eliminated the portions of the definition encompassing agreements to make future contributions.  *See* Federal Election Campaign Act Amendments of 1979, Pub. L. No. 96-187, Title I, § 101, 93 Stat. 1339, 1340 (1980).  "When Congress acts to amend a statute, [courts] presume it intends its amendment to have real and substantial effect."  *Stone v. I.N.S.*, 514 U.S. 386, 397 (1995); *see also Ross v. Blake*, 136 S. Ct. 1850, 1857–58 (2016) (interpreting a statute based in part on its amendment history).  The 1979 amendments to FECA's definition of "contribution" have important implications for determining where venue lies for a conduit contribution charge.  Because the amendments eliminated inchoate payments to a campaign from the statute's coverage, the offenses of making and of effecting a contribution remain incomplete at least until the contribution is received.  The legislative history of the 1979 amendments confirms this understanding.  The House Report accompanying the amendments explains that "[t]he provision in the [1971] Act making a written contract, promise, or pledge a contribution is deleted," such that "pledges will be reported only when the money or goods or services actually have been received by the committee."  H.R. Rep. 96-422, at 7 (1979).  A check sent to a political committee thus does not become a "contribution" within the meaning of FECA until that check is received, and, accordingly, the offenses of making and of effecting a conduit contribution require not only the sending but also the receiving of the donation.

Of course, in some circumstances, such as where a check is handed over to a campaign representative in-person, the sending and the receiving of the contribution occur at the same time and in the same place.  But in other circumstances, such as where the contribution is mailed, the sending of the contribution may occur in a different jurisdiction than the political committee's

receipt of that contribution.  Because sending and receiving may happen in different places, the conduct required to make or effect a conduit contribution can "implicate more than one location," *Lange*, 834 F.3d at 68–69, such that venue lies where the offense "was begun, continued, or completed," 18 U.S.C. § 3237(a).  At a minimum, then, venue for a conduit contribution charge lies where the contribution was sent and where it was received.  El-Saadi's argument that venue is proper only where the contribution was sent is thus unavailing.

Next, the Court considers whether venue for a conduit contribution charge also lies where a political committee accepts (rather than rejects) the contribution.  The government contends that the offense is not complete until the political committee "accept[s] [and] receive[s] for its benefit" the conduit contribution.  Dkt. 92 at 3.  As already explained, El-Saadi and Hill are charged both with "knowingly permit[ting] [their] name[s] to be used to effect" a conduit contribution and with aiding and abetting Khawaja in "mak[ing] a contribution in the name of another person."  52 U.S.C. § 30122.  The Court need not consider whether the offense of *making* of a conduit contribution encompasses the acceptance of that contribution, because the Court concludes that a contribution is not *effected* until the political committee accepts it.  Black's Law Dictionary defines "effect" as "[t]o bring about" or "to make happen."  Effect, Black's Law Dictionary (11th ed. 2019).  And Black's provides the following example of the correct usage: "the improper notice did not effect a timely appeal."  *Id.*  Likewise, the Oxford English Dictionary defines "effect" as "[t]o bring about," "to accomplish," or "[t] produce."  Effect, Oxford English Dictionary (3d ed. 2008).  These definitions make clear that a conduit contribution is not "effected" until it is "brought about" or "accomplished."  And the offense of permitting one's named to be used for a conduit contribution is not "brought about" or "accomplished" until the recipient political committee either wittingly or, as here, unwittingly

18

accepts that contribution in the name of a straw donor acting on behalf of an undisclosed principal. As the Court explained at oral argument, "[t]he effecting of the contribution is contingent on the unwitting committee being willing to accept it," because "[y]ou can't effect the contribution if the committee's going to say no." Dkt. 122 at 27.

Shakespeare's use of "effect" is illustrative of this point. In Henry VI, Part III, Warwick vows to "cross the sea [t]o effect [a] marriage" between King Edward and Lady Bona of France. William Shakespeare, Henry VI, Part III, act 2, sc. 6, l. 98–99. When would that marriage have been effected? Certainly, the marriage was not effected when Warwick set sail to deliver the proposal to King Louis XI of France. Nor was the marriage effected upon Louis's agreement in principle to the match. Rather, upon returning to England, Warwick discovered that Edward had decided to marry Lady Grey instead, and the marriage to Lady Bona was never effected. Suffice it to say, a marriage cannot be effected without both spouses-to-be saying "I do." So too with conduit contributions. The subterfuge is not effected until the recipient political committee decides to accept the money under the false pretense that the funds came from the straw donor.

The purpose of the prohibition on conduit contributions confirms the Court's textual analysis. As the Ninth Circuit explained in an opinion interpreting the ban on conduit contributions, FECA "sought to regulate campaign finance through a regime of disclosure requirements." *United States v. O'Donnell*, 608 F.3d 546, 553 (9th Cir. 2010). Conduit contributions undermine that goal by "shielding the identities of true contributors." *Id.* FECA thus banned conduit contributions to "ensure the complete and accurate disclosure of the contributors who finance federal elections." *Id.* at 553–54. And, as the allegations in this case illustrate, the ban on conduit contributions is also necessary to prevent circumvention of FECA's contribution limits and its prohibition of foreign contributions. Because Congress's purpose in

19

banning conduit contributions was to prevent the principal in the scheme from circumventing FECA's other requirements, it stands to reason that "effecting" a conduit contribution requires inducing the recipient political committee to accept the contribution as though it came from the conduit, rather than the true donor.

Bank fraud cases provide a useful analogy. In *United States v. Teman*, a defendant was charged with bank fraud for depositing 27 unauthorized checks, totaling $297,000, at a Bank of America location in Miami Beach, Florida. *United States v. Teman*, 465 F. Supp. 3d 277, 310 (S.D.N.Y. 2020). One of the drawee banks conducted a fraud review in New York, before Bank of America lifted a hold on the funds and released them to the defendant. *Id.* The court held that the fraud review in New York was sufficient to establish venue because "Signature Bank's review occurred during the pendency of the scheme" and was "a hurdle [the defendant] needed to clear by fraudulent means to gain the money he sought." *Id.* at 318–19; *see also United States v. Bankole*, 39 F. App'x 839, 842 (4th Cir. 2002) (finding venue proper in Virginia where parties to fraudulent transaction were in Maryland and New Hampshire but the credit union that processed the debit transaction "operate[d] its accounting processing" in Virginia). Likewise, a political committee's acceptance of a conduit contribution, as though it was, in fact, made by the conduit, is a necessary hurdle that a straw donor must clear before the unlawful contribution has been effected.

The Court's conclusion that venue is proper where a conduit contribution was received or accepted resolves Hill's motion with respect to the conduit contributions alleged in Counts 27 and 41. Count 27 alleges that Hill made a conduit contribution directly to Political Committee 6 in 2017, *see* Dkt. 1 at 46 (Indictment ¶ 86), while Count 41 alleges that he made a conduit contribution directly to Political Committee 7 in 2018, *id.* at 55 (Indictment ¶ 114). The

indictment does not provide additional details with respect to the 2017 contribution but indicates that the 2018 contribution came "in connection with an event hosted by KHAWAJA at his home [in California] for Elected Official 1." *Id.* at 36 (Indictment ¶ 58q).  In opposing Hill's motion, the government contends, with respect to Count 27, that "the evidence at trial will establish that Political Committee 6 was physically located in the District of Columbia and that it accepted, received for its benefit, and reported Defendant Hill's illegal contribution in the District of Columbia." Dkt. 111 at 5.  Similarly, with respect to Count 41, although the fundraiser in question occurred in California, the government again argues that "the evidence at trial will establish that Political Committee 7 was physically located in the District of Columbia and that it accepted, received for its benefit, and reported Defendant Hill's illegal contribution in the District of Columbia." *Id.* at 6.  Although the exact circumstances surrounding the conduit contributions alleged in Counts 27 and 41 are unclear from the face of the indictment, the recipients of those contributions are purportedly based in the District of Columbia.  If the receipt or acceptance of those contributions in fact occurred in the District of Columbia, then venue would be proper.  The government will ultimately need to prove to the jury, by a preponderance of the evidence, where the contribution was received and accepted.  *See Lam Kwong-Wah*, 924 F.2d at 301.  At this juncture of the case, however, without the benefit of a record established at a trial, the Court cannot conclude that venue in the District of Columbia is improper.  *See* Fed. R. Crim. P. 12(b)(3)(A)(i).  Hill's motion to dismiss will thus be denied with respect to Counts 27 and 41.

Matters are more complicated with respect to El-Saadi's alleged conduit contribution in Count 18 and Hill's alleged conduit contribution in Count 19.  The record suggests that Political Committee 2 received the conduit contributions in Counts 18 and 19 outside the District of

Columbia.  The connection to the District of Columbia, according to the government, is that Political Committee 2, which was a joint fundraising committee that included Political Committee 5, disbursed a portion of these contributions to Political Committee 5, which is based in the District of Columbia.  *See* Dkt. 92 at 3.  El-Saadi argues that, even if venue is proper where his contribution was initially received by Political Committee 2, "the subsequent transfer of that contribution" to Political Committee 5 in the District of Columbia "does not establish venue."  Dkt. 123 at 3.  According to El-Saadi, "[w]hile Political Committee 5 may have later received a portion of the alleged contribution, that disbursement is too far removed from . . . Political Committee 2's receipt of the contribution to establish venue."  *Id.* at 8.

At least some aspects of the regulations governing joint fundraising efforts support El-Saadi's position that a contribution to a joint fundraising committee outside the District of Columbia is neither synonymous nor simultaneous with a contribution to a participating committee within the District of Columbia.  Most significantly, the regulations require the joint fundraising committee to "establish a separate depository account to be used solely for the receipt and disbursement of the joint fundraising proceeds" and permits the joint fundraising committee to "delay distribution of the fundraising proceeds to the participants until all contributions are received and all expenses are paid."  11 C.F.R. § 102.17(c)(3).  An initial contribution to a joint fundraising committee is thus, in a sense, separated by both time (the possibility of delayed disbursement) and space (the separate account) from the eventual distribution of funds to the participating committees.  What's more, the participants in the joint fundraising effort report their respective portions of the net proceeds as "a transfer-in from the fundraising representative."  *Id.* § 102.17(c)(8)(i)(B).  That is potentially relevant because the 1979 amendments to FECA eliminated the portion of the statutory definition of "contribution"

that encompassed "a transfer of funds between political committees." *Compare* Federal Election

Campaign Act of 1971, Pub. L. No. 92-225, Title II, § 201, 86 Stat. 3, 8 (1972) *with* Federal

Election Campaign Act Amendments of 1979, Pub. L. No. 96-187, Title I, § 101, 93 Stat. 1339,

1340 (1980).  The House Report explains that the term "transfer," rather than the term

"contribution," covers "funds flowing between or among affiliated committees, committees

authorized by the same candidate, or political party committees regardless of whether such

committees are affiliated."  H.R. Rep. 96-422, at 7 (1979).  Although the legislative history also

mentions that the portion of the amendment dealing with transfers was not intended to be

substantive, *id.*, the change in the statutory text at least clarifies that a contribution is complete

before any later transfer between affiliated committees occurs.  But it's unclear whether

disbursements from joint fundraising efforts, like Political Committee 2, are the sort of transfers

that Congress meant to excluded from the statutory definition of "contribution."

The government responds that "the collection and disbursement of funds by Political

Committee 2 are not as separate as Defendant El-Saadi urges."  Dkt. 124 at 13.  In support of its

argument, the government relies on several other portions of the governing regulation.  Most

significantly, the regulation provides that, for reporting purposes, "the date of receipt of a

contribution by a participating political committee is the date that the contribution is received by

the fundraising representative."  11 C.F.R. § 102.17(c)(3)(iii).  Thus, even if the physical

disbursement of funds is delayed, Political Committee 2 and Political Committee 5 received the

conduit contributions at the same time in the eyes of the law.  And the regulation also requires

participating committees to "amend [their] Statement[s] of Organization to reflect" the joint

fundraising committee's separate depository account "as an additional depository."  *Id.*

§ 102.17(c)(3)(i).  Taken together, these provisions suggest, contrary to El-Saadi's position, that

the initial receipt of the contribution by the joint fundraising committee is separated by neither time nor space from the participants' receipt of their respective portions of the same funds.  In the government's view, other aspects of joint fundraising committees, moreover, indicate that they are best understood as pass-through entities.  For example, the joint fundraising committee must disburse funds based on a predetermined formula, *id.* § 102.17(c)(1), and both the names of the participating committees and the distribution formula must be disclosed in all solicitations, *id.* § 102.17(c)(2).  A joint fundraising committee thus functions principally to reduce transaction costs by allowing donors to write one check that is divided up among multiple participants.  *See* Michael S. Kang, *The Brave New World of Party Campaign Finance Law,* 101 Cornell L. Rev. 531, 559–60 (2016).  But the joint fundraising committee would have no purpose—and indeed could not even exist—in the absence of the component committees.  And the only reason to give money to a joint fundraising effort is to effect a contribution to the participating committees. Given the nature of joint fundraising committees, the mere fact that the alleged conduit contributions from El-Saadi and Hill passed through Political Committee 2 does not preclude venue in the District of Columbia, to the extent that the government can prove at trial that the contribution was either received or accepted by Political Committee 5 in the District of Columbia.

The question, however, remains where Political Committee 5 received or accepted El-Saadi's alleged conduit contribution in Count 18 and Hill's alleged conduit contribution in Count 19.  With respect to receipt, the government does not seem to contest that Political Committee 2 received the contributions outside the District of Columbia.  And under the regulation, Political Committee 5 received those contributions at the same time and place as Political Committee 2.

*See* 11 C.F.R. § 102.17(c)(3)(iii).  Venue in this District thus cannot be premised on Political

Committee 5's receipt of the conduit contributions.[6]

      That leaves where the conduit contribution was accepted.  The regulation requires both

the joint fundraising representative and the participating committees to "screen all contributions

received to insure that the prohibitions and limitations [in FECA and its implementing

regulations] are observed," including the prohibition on conduit contributions.  *Id.*

§ 102.17(c)(4)(i).  If Political Committee 5 conducted this screening in the District of Columbia,

just as the bank in *Teman* conducted its fraud review in New York, that would be sufficient to

support venue in this Court.  The indictment does not identify where Political Committee 5

reviewed the alleged conduit contributions in Counts 18 and 19 for compliance with FECA.  But

the indictment does allege that the offenses occurred "in the District of Columbia and

elsewhere," *see* Dkt. 1 at 40 – 41 (Indictment ¶¶ 68, 70), and the government does contend that

both of these contributions were "accepted . . . by Political Committee 5 in the District of

Columbia."  Dkt. 124 at 1; *see also* Dkt. 111 at 3.  If so, that would be enough to support venue

in this District.  The government will ultimately have to prove to the jury where Political

---

[6]  The government also argues that venue is proper where a political committee "report[s]" a
conduit contribution.  Dkt. 92 at 3.  But the Court need not consider at this juncture whether the
reporting of a contribution could in some circumstances support venue for a conduit contribution
charge, because the government in this case does not allege that the initial reporting of El-Saadi's
and Hill's conduit contributions occurred in the District of Columbia.  The regulations require
the fundraising representative, here Political Committee 2, to "report all funds received" in the
first instance.  *Id.* § 102.17(c)(8)(A).  The government does not seem to contest that Political
Committee 2 reported the contributions outside the District of Columbia.  After the funds are
dispersed, each participating committee, such as Political Committee 5, subsequently reports "its
share of net proceeds," but does so as a "transfer-in from the fundraising representative," not as a
contribution.  Because transfers between political committees are not included in FECA's
definition of "contribution," *id.* § 102.17(c)(8)(B), the offense of permitting one's name to be
used to effect a conduit contribution is complete before a participating committee in a joint
fundraising effort reports that it received the transfer of proceeds.

Committee 5 accepted those conduit contributions. At this stage, however, the Court cannot conclude that venue is improper. *See* Fed. R. Crim. P. 12(b)(3)(A)(i). The Court will, accordingly, deny El-Saadi's motion to dismiss Count 18 and Hill's motion to dismiss Count 19.

## B.   Motion for Separate Trial

El-Saadi next argues that his trial on the remaining conspiracy count should be severed from that of his co-defendants. Dkt. 83-1 at 14–19. Rule 8(b) permits two or more defendants to be charged together in a single indictment when they "are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). "There is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993); *United States v. Sutton*, 801 F.2d 1346, 1365 (D.C. Cir. 1986). Joint trials "play a vital role in the criminal justice system" by "promot[ing] efficiency" and "avoiding the scandal and inequity of inconsistent verdicts." *Zafiro*, 506 U.S. at 537 (internal quotation marks and citations omitted). Under Rule 14, however, "[i]f the joinder of . . . defendants in an indictment . . . appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14. The district court "enjoys wide discretion in determining whether to sever the trials of defendants who have properly been joined," but must be mindful of the strong presumption "in favor of joinder." *United States v. Ford*, 870 F.2d 729, 730 (D.C. Cir. 1989). "[A] district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539; *see also United States v. Slatten*, 865 F.3d 767, 810 (D.C. Cir. 2017). Even "[w]hen the risk of prejudice is heightened," however,

"less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Zafiro*, 506 U.S. at 539. As El-Saadi concedes, "this Court has not often granted motions to sever." Dkt. 83-1 at 14.

El-Saadi contends that severance is necessary here because of the "great disparity in the charges and evidence" against him as compared to the charges and evidence against his co-defendants, which he suggests "could lead to jury confusion and an erroneous conviction." *Id.* at 14. He argues that he will be prejudiced by the joinder of the Count 1 conspiracy, in which he is not charged, with the Count 13 conspiracy, in which he is charged. And he further asserts that he will be prejudiced by a joint trial with his co-Defendants in Count 13. *Id.* The Court is unpersuaded.

As the government points out, "a trial of the [Count 13] conspiracy necessarily will involve proof and witnesses that will overlap with the [Count 1] conspiracy." Dkt. 92 at 5. In the first conspiracy, Nader and Khawaja allegedly agreed to funnel foreign funds from Nader to Khawaja for the purpose of influencing the 2016 presidential election, and in the second conspiracy, Khawaja and the remaining defendants allegedly worked together to use Nader's money to make excessive and conduit contributions. Khawaja's acts in furtherance of the Count 13 conspiracy are thus also overt acts in furtherance of the Count 1 conspiracy, and the facts underlying the Count 1 conspiracy explain the origins and purpose of the Count 13 conspiracy. And, in light of this overlap, several of the same witnesses are expected to testify with respect to both conspiracies. *Id.* at 6–7. In these circumstances, the interests of judicial economy strongly support trying the two conspiracies together.

In reply, El-Saadi contends that he will be prejudiced by the allegations of "foreign influence" related to the first conspiracy, given that jurors are likely to react negatively to foreign

attempts to influence our elections and given that El-Saadi was unaware of the first conspiracy, much less any connection between that conspiracy and Foreign Country A. Dkt. 93 at 13–14. The Court agrees with the government that limiting instructions, if necessary, can address any risk of prejudice related to the first conspiracy's foreign ties. As the government points out, "the defense can highlight, and the government will acknowledge, that there is no evidence El-Saadi knew about the agreement between Khawaja and Nader." Dkt. 92 at 7. The Court will direct the jury, in considering Count 13, to decide whether a separate conspiracy existed and whether El-Saadi agreed to join and took overt acts in furtherance of that separate conspiracy. Severance of the trials for the two conspiracies is not warranted.

El-Saadi next argues that his trial should be severed from his co-defendants in the Count 13 conspiracy because of his relatively limited involvement. Dkt. 83-1 at 15–19. El-Saadi is charged in only two of the indictment's 52 counts. El-Saadi's participation in the conspiracy was apparently limited to making one conduit contribution at a fundraiser in 2016, but the overall conspiracy continued into 2018 and involved numerous other conduit contributions by his co-Defendants. And unlike several of the other defendants, El-Saadi is not accused of trying to cover up his crimes by lying to federal investigators. El-Saadi argues that these various disparities would render a joint trial fundamentally unfair, because "it would be unrealistic to expect jurors to be able to separate and compartmentalize the charges and evidence against Mr. El-Saadi from that of his co-defendants." *Id.* at 17.

As El-Saadi contends, the facts of this case bear at least some resemblance to those of *U.S. v. Mardian*, 546 F.2d 973 (D.C. Cir. 1976). In that case, the D.C. Circuit reversed the conviction of Robert C. Mardian for his role in the coverup of the break-in at the Watergate Office Building on the ground that the trial court had abused its discretion in denying a request

for a severance.  The Court of Appeals based its decision, in part, on the small role that Mardian had played within the larger conspiracy.  The court of appeals warned that, "where there is great disparity in the weight of the evidence, strongly establishing the guilt of some defendants, the danger persists that guilt will improperly 'rub off' on the others." *Id.* at 977 (citation omitted). The trial court should thus "use every safeguard to individualize each defendant in his relation to the mass" to avoid the "dangers of transference of guilt." *Id.* (quotation marks and citations omitted).  Mardian was charged in only the conspiracy count of a multi-count indictment, and he was involved in only five of the forty-five alleged overt acts in furtherance of that conspiracy. Further, Mardian, like El-Saadi, had been involved in only the early stages of a long-running conspiracy. *Id.* at 978.  And the volume of evidence implicating Mardian, like the volume of evidence relevant to El-Saadi, was less than the evidence pertaining to some of the other defendants. *Id.*

But despite these similarities, El-Saadi's reliance on *Mardian* is misplaced.  The D.C. Circuit in *Mardian* held that the trial court had *not* abused its discretion in denying a pretrial motion to sever, given the general rule favoring joinder. *Id.* at 979.  Once trial began, however, it became clear that only a small portion of the evidence pertained to Mardian, and then Mardian's chosen counsel "became ill and was forced to enter a hospital for surgery," such that he would be unavailable for "at least six weeks." *Id.*  At that point, Mardian renewed his motion for severance, which the government did not oppose. *Id.*  The D.C. Circuit thus required a new, separate trial based on "Mardian's interest in being represented by counsel of his own choice, combined with the disproportion of the evidence to his potential prejudice," and in light of "the prosecution indicat[ing] that in its view a separate trial would cause no undue disruption." *Id.* at 981.  Even granting that the government is likely to offer relatively less evidence against El-

Saadi than against his co-defendants, the other dispositive circumstances from *Mardian*, including the unavailability of counsel and the acquiescence of the government, are not present here.

In any event, El-Saadi overstates the disparity in allegations and evidence between him and his co-defendants, which is less substantial than in *Mardian*.  To be sure, the number of allegations against Khawaja, as the alleged hub of the second conspiracy, is far greater than against anyone else.  But El-Saadi's alleged participation in the second conspiracy is similar to the alleged roles of several other defendants.  Like those other defendants, El-Saadi is accused of taking money from Khawaja and then contributing that money to a political committee in connection with the 2016 election.  The proof of these conduit contributions will likely be of similar nature and quality, including copies of reports detailing the transactions.  El-Saadi allegedly made only one such contribution, while some of the others allegedly made more than one.  But that disparity alone is insufficient to show prejudice to any of El-Saadi's "specific trial right[s]," nor will a joint trial "prevent the jury from making a reliable judgment about guilt or innocence" in El-Saadi's case.  *Zafiro*, 506 U.S. at 539.  The Court will, of course, be attentive to its "continuing duty at all stages of the trial to grant a severance if prejudice does appear," *Mardian*, 546 F.2d at 979 (quotation marks and citations omitted), but at this stage, the Court is confident that instructions to the jury on its duty to consider the proof against each defendant individually will be sufficient to safeguard El-Saadi's rights.

**CONCLUSION**

For the foregoing reasons, it is hereby **ORDERED** that El-Saadi's motion to dismiss and to sever his trial, Dkt. 83, is **DENIED**.  It is further **ORDERED** that Hill's motion to dismiss, Dkt. 106, is **DENIED**.

**SO ORDERED**.


/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date:  July 20, 2021