**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **CRIMINAL NO. 1:19-cr-00374 (RDM)** |
| **MOHAMMAD "MOE" DIAB and** | ) | |
| **RANI EL-SAADI,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**GOVERNMENT'S OMNIBUS RESPONSE TO DEFENDANT EL-SAADI'S OMNIBUS
MOTION IN LIMINE (ECF No. 160)**

The defendant seeks to exclude three broad categories of relevant and admissible evidence:

(1) the true source of the funds that the defendant and his co-conspirators used to effect unlawful

conduit campaign contributions, which shows the nature, origin, and purpose of the conspiracy in

which the defendant participated, (2) a fabricated invoice prepared by the defendant to conceal the

nature of the reimbursement for his conduit contribution, which demonstrates the defendant's

willfulness, and (3) reporting processes at the Federal Election Commission ("FEC"), the

government agency charged with receiving and making public the political committee reports that

are required to contain information about the source of the contributions at issue.  The defendant's

effort to keep this highly probative and admissible evidence from the jury should be rejected, for

three reasons.

First, evidence of the true source of the funds that the defendant and his co-conspirators

used to effectuate the conduit contribution scheme is relevant to show the nature, origin, and

purpose of the scheme.  This evidence would provide important context for the jury to understand

the conspirators' actions, and it would not cause unfair prejudice, confusion, or delay.  Second, the

defendant's fabrication of a contemporaneous invoice to cover up his unlawful conduct is intrinsic

1

evidence of willfulness, an element of the crimes charged, and is thus admissible as relevant evidence of intent under Rule 402, not as an extrinsic "other act" under Rule 404(b).  Third, the government's planned use of a *lay* witness to testify about his personal knowledge of the reporting processes and procedures at the FEC is relevant to elements of the charged offenses and does not implicate rules regarding expert witnesses.

The defendant seeks to exclude this evidence because it is compelling evidence of his guilt. As the evidence at trial will establish, on August 24, 2016, co-conspirator Ahmad "Andy" Khawaja's company received a €1.9 million wire transfer from co-conspirator George Nader's company, a company registered in the United Arab Emirates.  This wire transfer supplemented a previous wire transfer that Khawaja's company received from Nader's company on July 18, 2016, for €2.5 million.  Both wire transfers were made with funds originating from the government of the United Arab Emirates and were effectuated for the express purpose of funding the conduit contributions charged in Count Thirteen, including defendant El-Saadi's conduit contribution.  Just *six days* after Khawaja received the second wire transfer from Nader—that is, on August 30, 2016—defendant El-Saadi generated an invoice for $150,000, purportedly for the provision of "VIP Services" that his company, LAX Express, would render to Khawaja in 2016, 2017, and 2018.  Just *nine days* after the date of the fabricated invoice—that is, on September 9, 2016— Khawaja's company transferred $149,000 to LAX Express and, on that *same day*, defendant El-Saadi made the $150,000 conduit contribution to Political Committee 2 and Political Committee 5.  The defendant's conduit contribution rendered him eligible to attend a small fundraiser with Candidate 1 in Las Vegas, Nevada, which was also attended by his co-conspirators, including Nader.  All of the foregoing transactions are contemporaneous and inextricably intertwined with one another, and the jury is entitled to consider, as part of its determination whether the defendant

is guilty of the charged offenses, how the scheme was financed, how it was concealed, and how it affected the FEC's administration of its reporting mandates and, by extension, the public's access to election-related information.

For the reasons that follow, the government respectfully submits that defendant's motion in limine should be denied.

# I.    EVIDENCE OF THE TRUE SOURCE OF THE FUNDS IS RELEVANT AND ADMISSIBLE UNDER FEDERAL RULE OF EVIDENCE 403

The jury is entitled to hear evidence of the true source of the funds that financed the conspiracy charged in Count Thirteen and all of the conduit contributions charged therein, including defendant El-Saadi's conduit contribution.  This evidence is intrinsic to the crime charged and probative of the origin, nature, and purpose of the conduit contribution conspiracy. Contrary to the defendant's claims, evidence that Nader provided the funds that financed the conspiracy charged in Count Thirteen is highly relevant, and its probative value is not substantially outweighed by a danger of unfair prejudice, misleading the jury, confusion, or delay.

## A.    Nader's Role in Count Thirteen Is Highly Probative and Admissible under D.C. Circuit Precedent

Defendant El-Saadi is charged with conspiracy to make conduit contributions, in violation of 18 U.S.C. § 371, and with one substantive count of making a conduit contribution, in violation of 52 U.S.C. §§ 30122 and 30109.  In order to find him guilty of the substantive violation, the jury must find that he willfully permitted his name to be used to effect contributions "of another" to the recipient committees.   Indictment ¶ 68 (ECF No. 1); *see* 52 U.S.C. § 30122.   Thus, the government's case requires proof that the funds at issue did not belong to defendant El-Saadi—*i.e.*, that they were funds "of another."  To meet its burden, the government will establish at trial that (1) Nader provided funds to Khawaja for the purpose of financing conduit contributions, (2)

Khawaja distributed these funds to defendant El-Saadi and his co-conspirators for the purpose of effecting conduit contributions, and (3) defendant El-Saadi used these funds to effect a $150,000 conduit contribution to Political Committee 2 and Political Committee 5.

The fact that Nader supplied the relevant funds to Khawaja for the purpose of making conduit contributions is properly alleged as part of the conspiracy with which the defendant is charged in Count Thirteen and, as discussed below, is inextricably intertwined with the remainder of the evidence in the case. *See* Indictment ¶ 52 (realleging and incorporating in Count Thirteen the overt acts charged in Count One, including the transfer of funds from Nader to Khawaja). This evidence is therefore admissible as intrinsic evidence of the nature, origin, and purpose of the conspiracy.

Prior rulings in the D.C. Circuit have established that the government has significant leeway in presenting evidence of the full scope, nature, and purpose of a charged conspiracy. *See*, *e.g.*, *United States v. McGill*, 815 F.3d 846, 879 (D.C. Cir. 2016) ("In conspiracy prosecutions, the prosecution is usually allowed considerable leeway in offering evidence of other offenses to inform the jury of the background of the conspiracy charged . . . and to help explain to the jury how the illegal relationship between the participants in the crime developed.") (citations and internal quotations omitted); *United States v. Evans¸* 216 F.3d 80, 86 (D.C. Cir. 2000) ("As a general matter the prosecution is entitled to present the 'whole story' of criminal misconduct in order to guard against" the risk that "the jury [could] miss the context of the events and the moral significance of the allegations, and thus render an unjustified acquittal."). The conspiracies in Count One and Count Thirteen are contemporaneous, but even where the evidence antedates the charged conspiracy, courts have held that it is nonetheless admissible to prove the existence and purpose of the conspiracy. *See United States v. Simmons*, 431 F. Supp. 2d 38, 58 (D.D.C. 2006)

(evidence of acts preceding conspiracy is admissible to prove "the existence and purpose of the conspiracy and the significance of later behavior"; such evidence is admissible "as either direct evidence of the conspiracy, or evidence inextricably intertwined therewith, and . . . not subject to Rule 404(b) analysis.").  Those principles apply to the instant matter in full force.

Nader's company, GS Investments, made two wire transfers to Khawaja's company, Allied Wallet, Inc.:  (1) a €2.5 million wire transfer on July 18, 2016 (Gov. Ex. 17, at 27), and (2) a €1.94 million transfer on August 24, 2016 (Gov. Ex. 18, at 16).  These transfers were made pursuant to a sham invoice that was prepared by defendant Diab, at Khawaja's direction, and sent to Nader by defendant Dekermenjian, also at Khawaja's direction.  *See* Gov. Exs. 35 & 36.  Moreover, the transfers occurred contemporaneously with the conspiracy with which defendant El-Saadi is charged, which the government will show spanned the time period from March 2016 to June 2018, and with the conduit contribution that defendant El-Saadi made, which the government will prove occurred in September 2016.  As a direct result of the conduit contributions financed by Nader, the members of the conspiracy attended a small fundraiser with Candidate 1 in Las Vegas, Nevada, in October 2016.  Only thirteen persons were invited to this event, including the eight defendants charged in the above-captioned case and their relatives.  *See* Gov. Ex. 81.  At the event, the defendant mingled with his co-conspirators and asked a question of Candidate 1, all in the presence of Nader, who financed the entire event, including defendant El-Saadi's conduit contribution.  To erase Nader from the evidence, as defendant El-Saadi now seeks, would present the jury with a severely distorted version of events and deprive the jury of critical information regarding the true nature of the criminal scheme.

Moreover, not only were the wire transfers from Nader to Khawaja made for the express purpose of financing the conduit contributions, but Nader could not have funneled the funds

without the defendant's and his co-conspirators' willing participation in the conspiracy.  Under 52 U.S.C. § 30121, it is unlawful to make contributions to the recipient political committees with foreign funds.  Nader attempted to circumvent this prohibition and funnel millions of dollars in foreign funds into the U.S. electoral system through the conspiracy, which would not have been possible without the defendant's and his co-conspirators' willingness to use these funds to effect political contributions in their names.  The foreign nature of the funds drove the purpose of the conspiracy in Count Thirteen, which in turn directly resulted in foreign funds being laundered as legitimate political contributions.  Put differently, without the defendant's and his co-conspirators' willingness to make conduit contributions, Nader would not have been able to funnel the foreign funds into the U.S. electoral system; and without Nader's foreign funds, the defendant would not have been able to make his conduit contribution.  These criminal transactions are interdependent, inextricably intertwined, and therefore admissible as highly probative evidence that is intrinsic to the charged offenses.  The jury is entitled to the full story.

## B. Defendant's Arguments Opposing Admissibility on Relevance, Rule 403, and Jury Confusion Grounds Are Unavailing

Notwithstanding the foregoing, defendant El-Saadi argues that Nader's role in his crimes amounts to nothing more than "colorful background evidence" that has "insignificant probative value."  Rani El-Saadi's Omnibus Motion (hereinafter, "Motion"), at 2 (ECF No. 160).  Defendant El-Saadi cites a string of cases in support of this contention, *id.* at 2-3, but those cases relate to different and distinguishable issues:  (1) the improper admission of hearsay, and/or (2) whether

the admission of evidence of a prior similar uncharged act was improper propensity evidence.[1]  In stark contrast, the proffered evidence regarding Nader as the true source of the funds in the instant matter is not hearsay, and there is no risk that the evidence will be considered as propensity evidence by the jury.  The defendant makes no argument to the contrary.  The Court should reject the defendant's out-of-context cherry-picking of language from cases addressing distinct evidentiary prohibitions that are not at issue here.

While minimizing the highly probative value of the Nader-related evidence, the defendant severely overstates the risk of prejudice that would result from its admission.  Rule 403 provides that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice."  *United States v. Crowder*, 141 F.3d 1202, 1210 (D. C. Cir. 1998) (en banc).  "'Unfair prejudice' within [the Rule 403] context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."  *United States v. Ring*, 706 F.3d 460, 472 (D.C. Cir. 2013) (citing Fed. R. Evid. 403 advisory committee's notes).  Lastly, because the defendant has invoked unfair prejudice under Rule 403, the Court is required to make an on-the-record factual determination demonstrating that the probative value of the evidence is substantially outweighed by unfair

---

[1]    *See Evans*, 216 F.3d at 87 (finding admission of "background" hearsay evidence being offered to establish the "state of mind of the police" was in error where there was "considerable danger that the jury would consider [the proffered evidence] as evidence of [the defendant's] propensity to commit the crimes with which he is charged."); *United States v. Sesay*, 313 F.3d 591, 599 (D.C. Cir. 2002) (finding that the trial court had improperly admitted hearsay because it was offered only for the truth of the matter asserted); *United States v. Robinson*, No. 16-cr-98, 2017 WL 11496711, at *2-3 (D.D.C. June 21, 2017) (excluding "background" hearsay evidence where probative value was substantially outweighed by the risk that "the jury would misuse the testimony as evidence of the truth of the complaints regarding Defendant's conduct—which would effectively constitute Rule 404(b) evidence of other, uncharged criminal acts."); *United States v. Asher*, 910 F.3d 854, 863 (6th Cir. 2018) (finding error where court admitted evidence of prior "virtually identical" conduct because of the risk that the jury would consider it as propensity evidence).

prejudice. *See United States v. Lavelle*, 751 F.2d 1266, 1279, 243 U.S. App. D.C. 47 (D.C. Cir. 1985) (requiring a district court "to make an on-the-record determination" of whether the probative value of other-bad-acts evidence substantially outweighs its prejudicial impact).  On these facts, the defendant cannot meet this heavy burden.

The defendant's claim that evidence of the foreign source of the conduit funds could lead the jury to convict on the basis of "outrage" over the involvement of foreign funds in U.S. elections—rather than on the crimes charged—is purely speculative.  Nor is there any indication that—even assuming the defendant's reference to a narrowly-focused social science article should be accorded any weight—certain beliefs that some members of the public hold regarding foreign interference will impermissibly infect the deliberations of the jury.  Any such concerns can be addressed through voir dire and appropriate jury instructions.  The evidence in question is limited in scope, as it concerns Nader's funds that the defendant and his co-conspirators used for their conduit contributions, and do not implicate foreign interference claims in general.  Additionally, the form of the evidence that the government plans to present is documentary in nature, and thus does not lend itself to even inadvertent manipulation for improper emotional appeal to a jury.

In any event, the probative value of the true-source evidence is not *substantially outweighed* by any danger of unfair prejudice.  The probative value of the evidence is clear: Evidence about the true source of the funds that the defendant and his co-conspirators used for unlawful conduit contributions speaks to the purpose of the conspiracy in which the defendant took part—the circumvention of campaign finance law—which in turn drove the manner and means of the conspiracy.  Where, as here, "the evidence indicates a close relationship to the event charged," "the balance [under Rule 403] should generally be struck in favor of admission." *United States v. Gartmon*, 146 F.3d 1015, 1021 (D.C. Cir. 1998) (citing *United States v. Moore*, 732 F.2d

983, 989 (D.C. Cir. 1984).  As described above, the source of the funds that the defendant used for unlawful conduit contributions is a key part of the charged conduit contribution conspiracy. Finally, the government does not offer this evidence "for an unfair purpose," for instance "on an ancillary issue or to inflame the jury." *Gartmon*, 146 F.3d at 1021.

Moreover, any concerns that evidence regarding the true source of the funds presents a risk of unfair prejudice under Rule 403 can be mitigated by an appropriate limiting instruction.  *See* Memorandum Opinion and Order, at 28 (ECF No. 128) (noting that any risk of prejudice related to evidence of the "foreign ties" to the funds can be addressed through the use of a limiting instruction); *see also United States v. Douglas*, 482 F.3d 591, 601 (D.C. Cir. 2007) (affirming conviction where trial court admitted potentially prejudicial evidence but properly instructed the jury on the "permissible and impermissible uses of the evidence"); *United States v. Edelin*, 118 F. Supp. 2d 36, 42 (D.D.C. 2000) ("Defendants argue that jury instructions would be insufficient to remove the risk of prejudice, but the Supreme Court has decided that jury instructions are presumed to be effective.") (citing *Richardson v. Marsh*, 481 U.S. 200, 206 (1987)).  The defendant argues that limiting instructions are insufficient to "cure the risk of unfair prejudice." Motion, at 4.  But the defendant fails to articulate how limiting instructions are insufficient to address any potential unfair prejudice.  As this Court previously noted, "[t]he Court agrees with the government that limiting instructions, if necessary, can address any risk of prejudice related to the first conspiracy's foreign ties."  Memorandum Opinion and Order, at 28 (ECF No. 128).  This is particularly true where, as the Court noted, "the defense can highlight, and the government will acknowledge, that there is no evidence that El-Saadi knew about the agreement between Khawaja and Nader."  *Id.*

Instead of grappling with the facts of this case, the defendant again cites inapposite cases, Motion, at 4, arguing that because limiting instructions were found to be insufficient in (1) the

seminal case involving "powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant," *Bruton v. United States*, 391 U.S. 123, 135 (1968); (2) a concurrence in a case examining the improper admission of hearsay, *Krulewitch v. United States*, 336 U.S. 440, 453 (1949) (Jackson J., concurring); and (3) the seminal case regarding the prohibition on presenting propensity evidence, *Old Chief v. United States*, 519 U.S. 172, 180 (1997), so too must a limiting instruction be insufficient here.   The government acknowledges that there are cases in which a limiting instruction is inadequate to cure any potential prejudice.   As the Court already found, this is not such a case, and the defendant's argument should therefore be rejected.[2]

Lastly, the defendant argues that evidence of the source of the funds could confuse the issues, mislead the jury, and waste the jury's time.   These arguments, too, fail.   As to defendant El-Saadi's argument that the indictment and the government's trial brief set forth inconsistent theories regarding the defendant's participation in the conspiracy with which he is charged, Motion, at 5, there is no such inconsistency.   As set forth in both the indictment and the trial brief, Nader funneled funds to Khawaja, who in turn funneled funds to the defendant.   There is no inconsistency there.   The defendant claims that this flow of funds could confuse the jury, but that claim is entirely speculative.   As the Court succinctly stated in its July 20, 2021, ruling, "[i]n the first conspiracy, Nader and Khawaja allegedly agreed to funnel foreign funds from Nader to Khawaja for the purpose of influencing the 2016 presidential election, and in the second conspiracy, Khawaja and the remaining defendants allegedly worked together to use Nader's

---

[2]      Defendant El-Saadi also claims, Motion, at 3 n.2, that the very presence of George Nader in this case creates the risk of prejudice.   The government has no intention of presenting Nader's unrelated crimes to the jury, and any risk can be mitigated by a well-crafted voir dire question that inquires into any potential juror's prior familiarity with Nader.

money to make excessive and conduit contributions." Memorandum Opinion and Order, at 27 (ECF No. 128). The Court had no trouble following the thread of the funds, and there is no reason to believe that the jury would not be able to understand the evidence either, particularly where the government will present evidence at trial that traces the funds from Nader, to Khawaja, to the defendant and his co-conspirators, to the recipient committees.

Defendant El-Saadi also tries to make much of the fact that the government charged two conspiracies in this case, but he ignores the fact that the grand jury returned an indictment that, at the outset of the second conspiracy charge set forth in Count Thirteen, realleged and incorporated each and every overt act from the first conspiracy as set forth in Count One, including the allegations regarding the transmission of funds from Nader to Khawaja. *See* Indictment ¶ 52. The defendant did not move to strike those allegations. And defendant El-Saadi's claim that proof of the source of the funds will waste the jury's time should give the Court no pause. The government has no intention of presenting evidence of the precise contours of the Count One conspiracy and will be efficient in its presentation of evidence establishing the flow of funds from Nader through Khawaja to defendant El-Saadi and his co-conspirators.

In sum, evidence that Nader was the true source of the funds at issue is intrinsic to the charged offenses, probative, and not unduly prejudicial. This evidence also would not confuse the issues, mislead the jury, or cause undue delay. To the contrary, it is the *withholding* of this important information that would cause the jury to be misled about the origin, nature, and purpose of the scheme. The jury is entitled to this evidence and the defendant's motion to exclude it should be denied.

II.   **THE FABRICATED INVOICE (GOV. EX. 10, at 1) IS INTRINSIC EVIDENCE OF DEFENDANT EL-SAADI'S WILLFULNESS**

A.   **Relevant Background**

Defendant El-Saadi is charged with participating in the conspiracy charged in Count Thirteen by making a $150,000 contribution to Political Committee 2 and Political Committee 5 on September 9, 2016, with funds that he obtained from Khawaja.  Indictment ¶ 58(g).  Defendant El-Saadi is also charged in Count Eighteen with willfully permitting his name to be used to effect a contribution of another to Political Committee 2 and Political Committee 5 and willfully causing the same entities to unwittingly accept a contribution made by one person in the name of another. Indictment ¶ 68.

As the evidence will show at trial, defendant El-Saadi owns LAX Express, a travel services provider based in Los Angeles, California.  *Id.* ¶ 7.  Khawaja used LAX Express for luxury transport to and from the Los Angeles, California, airport during the relevant time period.  *See, e.g.*, Gov. Ex. 10, at p. 2–8; Gov. Ex. 38.  Additionally, LAX Express used the services of Khawaja's company, Allied Wallet, Inc., for its online payment processing.  *See* Gov. Ex. 87. Defendant El-Saadi's $150,000 conduit contribution was financed with funds that LAX Express received from Allied Wallet which, in turn, Allied Wallet had received from GS Investments, a UAE-registered company, in July 2016 (Gov. Ex. 17, at 27) and August 2016 (Gov. Ex. 18, at 16) for the purpose of funding the conduit contributions charged in Count Thirteen, including defendant El-Saadi's contribution.

Specifically, on September 9, 2016, Allied Wallet wire transferred $149,000 to LAX Express from a business account maintained by SAXO Payments A/S.  *See* Gov. Ex. 34, at 68 ("payment per Andy [Khawaja] to LAX Express"); Gov. Ex. 5A, at 38.  The next day, on September 10, 2016, defendant El-Saadi effectuated an in-person transfer of $150,000 from the

LAX Express business account to his personal bank account. *See* Gov. Ex. 5B.  As noted, defendant El-Saadi wrote a check to Political Committee 2 on September 9, 2016 (Gov. Ex. 5C) from his personal bank account, and the funds were deducted from his personal bank account on September 21, 2016.  Gov. Ex. 5D, at 2.  Defendant El-Saadi's personal bank account had a beginning balance of $13,473.04 and an ending balance of $11,950.65 for the month of September 2016.  *Id.*

On April 10, 2019, the government served a grand jury subpoena on defendant El-Saadi through his then-counsel, Harland Braun of the law firm Braun & Braun LLP, for LAX Express records.  Gov. Ex. 93.  Mr. Braun accepted service on behalf of LAX Express.  *Id.* at 1.  In response to this subpoena, defendant El-Saadi produced, among other items, the following handwritten invoice (Gov. Ex. 10 at 1):

On its face, the invoice purports to show that LAX Express agreed to provide "VIP Services" to Khawaja from 2016 through 2018 in exchange for a $150,000 payment.  The invoice was dated August 30, 2016—that is, approximately 10 days before Khawaja effectuated the $149,000 wire transfer from Allied Wallet to LAX Express.

The government intends to introduce probative, circumstantial evidence at trial showing that this invoice was fabricated to conceal the true purpose of the $149,000 wire transfer from Allied Wallet to LAX Express on September 9, 2016.  In reality, the funds were transferred not for the purpose of providing VIP Services to Khawaja but to fund defendant El-Saadi's conduit contribution to Political Committee 2 and Political Committee 5 with funds obtained from the UAE.[3]  Accordingly, the government intends to prove at trial that defendant El-Saadi fabricated the invoice to disguise the funds that he received from Allied Wallet on September 9, 2016, as a legitimate commercial transaction when, in fact, he received the funds for the illicit purpose of effecting a conduit contribution.  As discussed below, the fabricated invoice is admissible as evidence of defendant El-Saadi's willfulness, which is an element of the charged offenses in Count Thirteen and Count Eighteen, and therefore intrinsic to his crimes.

## B.    The Fabricated Invoice Is Intrinsic Evidence and Therefore Admissible

It has been long established that a defendant's fabrication of exonerating evidence is probative of guilt, the value of which is to be weighed by the jury.  *See, e.g.*, *Wilson v. United*

---

[3]    The government also intends to call at trial Iancu "John" Gusita, a close associate of defendant El-Saadi and the only LAX Express employee—other than defendant El-Saadi—who appears to have knowledge of invoicing matters involving Allied Wallet during the relevant time period.  Upon information and belief, however, Mr. Gusita boarded a flight from Los Angeles, California, to Doha, Qatar, on November 21, 2021, just five days after the government notified defense counsel via email that it intended to call Mr. Gusita as a witness at trial—which at that time was scheduled for December 6, 2021—and before government agents could serve Mr. Gusita with a trial subpoena.

*States*, 162 U.S. 613, 621 (1896) ("The destruction, suppression or fabrication of evidence undoubtedly gives rise to a presumption of guilt to be dealt with by the jury."); *Harvey v. United States*, 215 F.2d 330, 332 (D.C. Cir. 1954) (holding that "fabrication of evidence of innocence is cogent evidence of guilt"); *United States v. Perholtz*, 842 F.2d 343, 358-359 (D.C. Cir. 1988) (holding that fabricated evidence was admissible at trial because it was "closely tied to the crimes charged and only indirectly suggest[ed] distinct offenses"; did "not involve past acts having little temporal or logical connection to the crimes at issue"; and the "jury could properly infer [from it] that the defendants were conscious of their roles in the scheme") (citations omitted).  This long-established principle is by itself dispositive of the instant motion.

Notwithstanding, defendant El-Saadi urges the Court to exclude relevant evidence, the probative value of which is the sole province of the jury, by arguing that the fabricated invoice is Rule 404(b) evidence that the government failed to notice by the Court's deadline.  Motion, *passim*. The government did not provide notice of Rule 404(b) evidence because, simply put, the fabricated invoice is not Rule 404(b) evidence.  The leading case in the D.C. Circuit addressing this issue held over 20 years ago that uncharged acts are admissible as intrinsic evidence (1) if the evidence is of an act that is part of the charged offense or (2) the act was performed contemporaneously with the charged crime and facilitated the commission of the charged crime.  *See United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000) (citations omitted).[4]  The fabricated invoice meets both criteria,

---

[4]     *See also McGill*, 815 F.3d at 878–82 (D.C. Cir. 2016) (relying on *Bowie* to reaffirm admission of the "bulk of the evidence" at trial as intrinsic to the conspiracy charge even where such acts were not explicitly pled); *United States v. Alexander*, 331 F.3d 116, 125-126 (D.C. Cir. 2003) (relying on *Bowie* to affirm admission of out-of-court statement that the defendant "[has] a gun on him now" as intrinsic evidence to felon-in-possession charge); *cf. United States v. Moore*, 651 F.3d 30, 63–64 (D.C. Cir. 2011) (agreeing with defendants that certain non-intrinsic evidence was admitted in error under *Bowie* but holding such error not reversible).

and it is up to the jury to determine whether defendant El-Saadi's act of fabrication should factor into its deliberation of guilt or innocence.

It bears noting that, to meet its burden under Count Thirteen and Count Eighteen, the government must prove that defendant El-Saadi acted willfully. Courts have long admitted false exculpatory evidence—such as the fabricated invoice at issue—as evidence of a defendant's willfulness. For example, in *United States v. Kahan*, the Supreme Court held that a defendant's false exculpatory statements prior to trial were admissible as evidence of willfulness. 415 U.S. 239, 239-242 (1974). The defendant in *Kahan* had been accused of accepting gratuities for official acts, in violation of 18 U.S.C. § 201, which he deposited in four bank accounts held in revocable trusts for his children, and perjury before the grand jury, in violation of 18 U.S.C. § 1623. *Id.* at 241. At his arraignment, the defendant was appointed counsel under the Criminal Justice Act of 1964, following his false representation to the district court that he did not have access to funds to employ an attorney—even though he had access to approximately $27,000 in the four bank accounts. *Id.* At trial, the defendant's statements "were admitted as false exculpatory statements evincing [his] consciousness that the bank deposits were incriminating, and as evidence of willfulness in making statements before the grand jury with knowledge of their falsity." *Id.* Lower courts have time and again reaffirmed the principle that fabrication of evidence—such as the fabricated invoice at issue—is admissible to prove a defendant's willfulness. *See*, *e.g.*, *United States v. Sebold*, 547 F. App'x 278, 280 (4th Cir. 2013) (holding that "willfulness can be inferred from making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal") (citing *Spies v. United States*, 317 U.S. 492, 499 (1943));

*United States v. Mendoza*, 685 F. App'x 345, 349 (5th Cir. 2017) (affirming admission of defendant's confessions that she fabricated items in tax returns as evidence of willfulness and holding that any issues of credibility regarding the evidence was the province of the jury); *United States v. Guidry*, 199 F.3d 1150, 1157 (10th Cir. 1999) (holding that making false entries or documents or invoices may be circumstantial evidence of willfulness).  This principle applies to the instant matter in full force, and the government should be allowed to present the jury with the fabricated invoice as evidence of defendant El-Saadi's willfulness, which is an element of the charged offenses.

In sum, the fabricated invoice is not 404(b) evidence.  It is admissible evidence as part and parcel of the charges in Count Thirteen and Count Eighteen—namely, a willful act designed to conceal the true source and purpose of the funds transferred from Allied Wallet to LAX Express, which financed a near totality of defendant El-Saadi's conduit contribution to Political Committee 2 and Political Committee 5.  Defendant El-Saadi cites no case law or legal authority to the contrary because there is none, and it is clear from the Indictment and the anticipated evidence at trial that the fabricated invoice constitutes an overt act in furtherance of the conspiracy and, subject to the jury's determination, proof of willfulness, which is an element of both Count Thirteen and Count Eighteen.  Whether the fabricated invoice was explicitly pled in the Indictment as an overt act in Count Thirteen is of no legal moment for purposes of admissibility.  *See United States v. McGill*, 815 F.3d 846, 881 (D.C. Cir. 2016) ("As a general matter, '[w]hen [the] indictment contains a conspiracy charge, uncharged acts may be admissible as direct evidence of the conspiracy itself.'") (quoting *United States v. Thai*, 29 F.3d 785, 812 (2d Cir. 1994)); *United States v. Hong Vo*, 978 F. Supp. 2d 49, 57 (D.D.C. 2013) (the government may prove a conspiracy by overt acts not specified in the indictment).  As such, defendant El-Saadi's motion to exclude the fabricated invoice should

be denied.[5]

## III.   THE GOVERNMENT WILL NOT PRESENT EXPERT TESTIMONY AT TRIAL

As noted in the government's Trial Memorandum, the government intends to present testimony from a representative of the Federal Election Commission ("FEC") as part of its case-in-chief.  *See* United States' Trial Memorandum, at 9 (ECF No. 158).  Defendant El-Saadi mistakenly asserts that the government "may try to elicit testimony regarding federal election law from either an FEC representative or an FBI Special Agent," Motion, at 8, to argue that any such testimony ought to be excluded as improperly noticed expert testimony or, in the alternative, as impermissible "legal expert" testimony.  *Id.* at 8–9 (quoting *Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1212 (D.C. Cir. 1997) ("Expert testimony that consists of legal conclusions cannot properly assist the trier of fact . . . and is thus not 'otherwise admissible.'").  But the government has no intention of offering expert testimony or testimony regarding the law from any witness.

At trial, the government intends to present the lay testimony of Michael Hartsock of the FEC.

---

[5]      On November 15, 2021, the parties exchanged trial exhibits pursuant to the Court's scheduling order.  *See* Scheduling Order ¶ 5 (ECF No. 104).  The fabricated invoice was included in the government's submission to defendant El-Saadi, and defendant El-Saadi similarly included it in his submission to the government.  Because the fabricated invoice was initially produced by defendant El-Saadi and both parties have provided notice of their intention to introduce it at trial, the defendant's belated complaint that it should be excluded on Rule 404(b) notice grounds rings hallow, especially in light of his failure to file a Motion in Limine by the Court-imposed deadline of September 17, 2021.  *Id.* ¶ 4.  Accordingly, should the Court disagree with the government's position that the invoice is intrinsic evidence, the government respectfully submits that the Court should nonetheless admit it as Rule 404(b) evidence considering that the defendant has had ample notice of the government's intent to introduce it at trial.  *See United States v. Robinson*, 255 F. Supp. 3d 199, 203 n.3 (D.D.C. 2017) ("Defendant argues in his motion that the government may not present this evidence under Rule 404(b) because it did not give formal notice of its intent to do so by a Court-ordered deadline.  The government's failure to comply with this deadline is presumably a result of the fact that the government primarily contends that this evidence is not Rule 404(b) evidence, but instead evidence of a necessary element of its money laundering charges.  To the extent the Court finds that the evidence is properly admissible under Rule 404(b), it rejects Defendant's notice argument because Defendant has been on notice of the content of Dr. Romanoff's proposed testimony since as early as May, 2016.").

Mr. Hartsock will testify from personal knowledge that the FEC receives reports from political committees called "FEC Form 3X," which, among other items, reports a committee's itemized receipts (*i.e.*, the source, amounts, and dates of reportable political contributions) in a given time period. *See*, *e.g.*, Gov. Ex. 3C.  Mr. Hartsock has direct, personal knowledge that the FEC checks the Form 3X Reports for facial sufficiency and then publishes them online for access by any person.  The FEC performs these tasks to fulfill a function of providing accurate information to the public about the political contributions received by a political committee.  The FEC's review of these reports may also lead the agency to make further inquiries or to refer a matter for additional enforcement action.  This is a function in which Mr. Hartsock has personal knowledge and experience.  Such testimony is important to provide context regarding the filing and processing of FEC reports, to explain the role and proper administration of the FEC, and to establish the materiality of any false statements in those reports. *See* Indictment ¶ 53(c) (charging as an object of the conspiracy violations of 18 U.S.C. § 1001, which require proof of materiality in false statements or representations made in a matter within the jurisdiction of the executive branch) and ¶ 53(d) (charging violations of 18 U.S.C. § 1519, which directly implicate the proper administration of the FEC, as an object of the conspiracy).

Contrary to defendant El-Saadi's contention, the government does not intend to present Mr. Hartsock as an expert or to elicit legal opinions from him.  He is not a lawyer and will confine his testimony to his personal knowledge and understanding of the FEC's functions, which is based on his personal experience and observations.  That is non-expert testimony, and to the extent that Mr. Hartsock offers any insights based on first-hand experience, that testimony would also be permissible without expert qualification. *See United States v. Williams*, 827 F.3d 1134, 1155 (D.C. Cir. 2016) (holding that a non-expert witness may offer lay opinion "where it is '(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or determining a fact in issue; and (c) not based on scientific, technical, or other specialized

knowledge' of the sort that is properly the subject of expert opinion testimony under Fed. R. Evid 702.") (quoting Fed. R. Evid. 701).   Nor is Mr. Hartsock's anticipated testimony specialized knowledge, *see* Motion, at 8; rather, Mr. Hartsock's anticipated testimony is grounded solely on his day-to-day experience as an employee of the FEC, which is entirely permissible under Fed. R. Evid. 701.   *See, e.g.*, *United States v. Robinson*, 2017 U.S. Dist. LEXIS 227422, *6 (D.D.C. July 13, 2017) ("Moreover, to the extent the pharmacists' testimony could be construed as presenting an opinion, the statements the Court has deemed admissible would be at most [Fed. R. Evid. 701] lay opinions based on their day-to-day business experience as pharmacists"); *see also Atlanta Channel, Inc. v. Solomon*, 2021 U.S. Dist. LEXIS 176981, *8-9 (D.D.C. Sep. 17, 2021) ("A non-expert witness may draw upon 'perceptions based on industry experience' as a 'sufficient foundation for lay testimony opinion.'") (quoting *United States v. Oldrock*, 867 F.3d 934, 940 (8th Cir. 2017)).

At bottom, Mr. Hartsock's anticipated testimony is based on fact, will not offer expert or legal opinions, and will instead aid the jury in understanding the FEC's function of reviewing and processing reports regarding political contributions that individuals such as defendant El-Saadi make to political committees in a given period.   This non-expert testimony is relevant to the charged offenses and should be admitted as such.

Respectfully submitted,
COREY R. AMUNDSON
Chief, Public Integrity Section
Criminal Division
U.S. Department of Justice

By:   */s/ Victor R. Salgado*
**Victor R. Salgado**
Senior Litigation Counsel
D.C. Bar No. 975013
**Michelle K. Parikh**

Trial Attorney
D.C. Bar No. 1044532
Public Integrity Section
Criminal Division
U.S. Department of Justice

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this date, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys of record for the defendants.


Dated:  December 22, 2021                    */s/ Victor R. Salgado*
                                             Victor R. Salgado
                                             Public Integrity Section
                                             Criminal Division
                                             U.S. Department of Justice