UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>  v.<br><br>MOHAMMAD "MOE" DIAB, AND RANI EL-SAADI,<br><br>                    Defendants. | No. 1:19-cr-374-6 (RDM) |

### RANI EL-SAADI'S REPLY IN SUPPORT OF HIS OMNIBUS MOTION IN LIMINE

Justin V. Shur
D.C. Bar #973855
Kenneth E. Notter III
D.C. Bar #1708367
MOLOLAMKEN LLP
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
Telephone: (202) 556-2000
Facsimile:  (202) 556-2001
jshur@mololamken.com

Megan Cunniff Church
Admitted *pro hac vice*
IL Bar #6281234
MOLOLAMKEN LLP
300 N. LaSalle Street
Suite 5350
Chicago, IL 60654
Telephone: (312) 450-6700
Facsimile:  (312) 450-6701

*Attorneys for Rani El-Saadi*

The government wants to try this case as if Mr. Nader or Mr. Khawaja were sitting at the defense table next to Mr. El-Saadi. But neither Mr. Nader nor Mr. Khawaja is on trial. It is just Mr. El-Saadi.[1] And he is entitled to a trial limited to the accusations against him and based on evidence—not prejudice, speculation, or unnoticed expert testimony. To ensure that he gets the fair trial he deserves, Mr. El-Saadi respectfully asks that the Court preclude the government from (1) offering any evidence regarding the Nader–Khawaja allegations; (2) arguing in its opening statement that Mr. El-Saadi fabricated an invoice or any other document; or (3) eliciting testimony from Michael Hartsock on any matter requiring specialized knowledge.

### I. THE NADER–KHAWAJA ALLEGATIONS ARE GRATUITOUSLY PREJUDICIAL AND SHOULD BE EXCLUDED UNDER RULE 403

No matter how many times the government says it, the Nader–Khawaja allegations are not "highly probative." Dkt. 163 ("Gov't Resp.") at 1, 3, 6, 7. Take the government's argument that those allegations are probative of whether Mr. El-Saadi "willfully permitted his name to be used to effect contributions 'of another.'" Gov't Resp. 3. That argument just doesn't track. As the government concedes, Mr. El-Saadi knew nothing about the alleged Nader–Khawaja scheme, Dkt. 92 at 7, so that scheme cannot be probative of Mr. El-Saadi's willfulness. Nor are the allegations probative of whether Mr. El-Saadi was the true donor. If the government can prove that Mr. El-Saadi's contribution was "actually made by KHAWAJA," Dkt. 1 ¶ 57(c), further evidence that the funds originated with Mr. Nader would not make it any more likely that Mr. El-Saadi was not the

---

[1] Any hope for a joint trial with Mr. Diab disappeared when the government inadvertently sent Mr. El-Saadi a hard drive with child pornography mixed in with the material from the District of Massachusetts investigation. Mr. El-Saadi's counsel received a child-pornography-free hard drive on December 29, more than two weeks after the government was made aware of the tainted hard drive. However, counsel understands that Mr. Diab's counsel has not been able to review the materials yet as he is *still* working with the District of Massachusetts prosecutors to obtain a copy without child pornography. Given these developments, it is inconceivable that Mr. Diab will be ready for a joint trial on January 25 or any other time in the first half of the new year.

1

true donor, *see* 1 *McCormick on Evidence* § 185 (8th ed. rev. 2020) (probative value is tendency of evidence to make a disputed fact "more or less likely" than without the evidence).

The government's main argument regarding probative value, however, is that the Nader–Khawaja scheme is "important context"—that is, background—for the conspiracy charge against Mr. El-Saadi. Gov't Resp. 1. But as Mr. El-Saadi already explained, "background" evidence by nature has diminished probative value. *See* Dkt. 160 ("Mot.") at 2-3. The government never confronts that reality. Instead, it deflects by noting that the cases Mr. El-Saadi cites involved hearsay or propensity evidence. Gov't Resp. 7 & n.1. True but irrelevant. That those cases involved hearsay or propensity evidence does not detract from the independent recognition in those cases that **under Rule 403** background evidence has limited probative value.[2] In any event, other cases not involving hearsay or propensity evidence also recognize the marginal probative value of background evidence. *E.g.*, *United States v. Kilmartin*, 944 F.3d 315, 337-38 (1st Cir. 2019), *cert. denied*, 140 S. Ct. 2658 (2020); *United States v. Boros*, 668 F.3d 901, 908-10 (7th Cir. 2012). Either way, there is no getting around it: Background evidence carries little probative value, making it ripe for exclusion under Rule 403.

The "important context" argument hits other snags too. The government says the Nader–Khawaja scheme is context that "speaks to the purpose of the conspiracy" Mr. El-Saadi is charged with joining. Gov't Resp. 8. The government even claims that the "foreign nature of the funds drove the purpose of the conspiracy in Count Thirteen." Gov't Resp. 6. Not true. Count 13 has a dedicated section titled "purposes of the conspiracy." Dkt. 1 ¶¶ 54-56. That section lists three

---

[2] *See United States v. Evans*, 216 F.3d 80, 87 (D.C. Cir. 2000) ("background" evidence had such "insignificant probative value" to favor exclusion under Rule 403); *United States v. Sesay*, 313 F.3d 591, 599 (D.C. Cir. 2002) (weighing the prejudice of propensity evidence against the minimal probative value of "background" evidence under Rule 403); *United States v. Robinson*, No. 16-cr-98, 2017 WL 11496711, at *2 (D.D.C. June 21, 2017) (same).

2

specific purposes: (1) "to facilitate unlawful campaign contributions from KHAWAJA," Dkt. 1 ¶ 54; (2) to cause certain political committees to file reports "falsely stating that the contributions were made by various co-conspirators . . . when in reality they were funded by KHAWAJA," Dkt. 1 ¶ 55; and (3) to conceal that alleged "unlawful activity," Dkt. 1 ¶ 56.  There is no mention of Mr. Nader or foreign funds.  *Cf. United States v. McGill*, 815 F.3d 846, 882 (D.C. Cir. 2016) (cited at Gov't Resp. 4) (evidence probative of "specifically alleged . . . goal of the conspiracy").  The government cannot rewrite the indictment to expand the stated purposes of the alleged conspiracy; it is stuck with "the plain language and structure of Count [13]." *United States v. Hitt*, 249 F.3d 1010, 1019 (D.C. Cir. 2001).

It is no answer to point out that Count 13 incorporates the Nader–Khawaja allegations by reference.  *See* Gov't Resp. 4, 11.  Those allegations are "realleged" in the throwaway preamble paragraph of Count 13, not in the section reciting the objects, purposes, manner or means, or overt acts.  Dkt. 1 ¶ 52 (incorporating ¶¶ 1-29); *see Hitt*, 249 F.3d at 1019 (emphasizing indictment's structure).  That same paragraph also "realleges" the bombshell that Bill Clinton is Hillary Clinton's spouse.  Dkt. 1 ¶ 10.  The Clintons' marriage is certainly "background" evidence.  *See* Dkt. 1 ¶¶ 29(q)-(s).  But that does not infuse the Clintons' marriage license with sufficient probative value to survive a Rule 403 challenge in a trial against Mr. El-Saadi.  The same goes for the Nader–Khawaja scheme; it is background that barely crawls across the line into relevance.  Far from undermining Mr. El-Saadi's motion, then, the government's incorporated-by-reference argument underscores just how tangential the Nader–Khawaja allegations are to the case against Mr. El-Saadi.

The government strays further from reality in proclaiming that the Nader–Khawaja scheme is "inextricably intertwined" with the "story" of the conspiracy charged against Mr. El-Saadi.  *See*

3

Gov't Resp. 1-2, 4, 6.  Just read paragraphs 53 to 58 of the indictment.  Mr. Khawaja—not Mr. Nader—is the alleged "true source" of every contribution.[3]  In fact, Mr. Nader appears just once to note his presence at the Las Vegas event.  There is no mention of the UAE or foreign money.  Even so, Count 13 tells a coherent (albeit fictional) story.  Keeping the foreign-interference allegations out does not distort the narrative or deprive the jury of any important information.  *Contra* Gov't Resp. 5, 11.  To the contrary, doing so lets the jury evaluate Mr. El-Saadi's conduct in the context it occurred—without knowledge of the alleged foreign interference.  And it presents the same story (without Mr. Nader or foreign funds) that the government deemed fit to tell in the statement of offense for Mr. El-Saadi's alleged co-conspirators.  *See* Gov't Exs. 61, 64, 67, 69.  In the end, the Nader–Khawaja allegations are a footnote.

While finding probative value here is like wringing water from a stone, spotting the danger of unfair prejudice is easy.  Foreign interference in a U.S. presidential election inspires a fierce emotional reaction in nearly every American.  The government plans to tell the jury that Mr. El-Saadi helped a foreign power interfere in a U.S. presidential election.  It wants to hit the jury over the head with talk of foreign interference during opening, through witnesses, with documents, and at closing.  *See* Dkt. 158 at 17-18.  Even with an instruction clarifying that Mr. El-Saadi knew nothing about the foreign interference, there is palpable danger that a juror would ride a wave of emotion to a guilty verdict no matter what the evidence shows.  It is equally plausible that a properly instructed juror might accept that Mr. El-Saadi is blameless in the foreign interference

---

[3] *See, e.g.*, Dkt. 1 ¶54 (alleging "purpose of the conspiracy to facilitate unlawful campaign contributions from KHAWAJA"); Dkt. 1 ¶55 (contributions actual "funded by KHAWAJA"); Dkt. 1 ¶57(a) ("KHAWAJA funneled more than $1.8 million to the conspirators to contribute . . . as he directed."); Dkt. 1 ¶57(b) (alleged conspirators used "monies funneled to them by KHAWAJA"); Dkt. 1 ¶57(c) (alleging contributions "were actually made by KHAWAJA"); Dkt. 1 ¶57(d) (contributions allegedly "fund[ed] KHAWAJA's political contributions"); Dkt. 1 ¶58(a)-(t) (every overt act involving money from Mr. Khawaja because **he** had maxed out contributions).

4

but still treat Mr. El-Saadi's (minor) association with someone who worked with a foreign power to corrupt a U.S. election as proof of Mr. El-Saadi's guilt.  Unfair prejudice abounds.

That the government (at 8) dismisses these dangers as "speculative" betrays a misunderstanding of Rule 403.  That rule calls for courts to assess the danger of unfair prejudice evidence poses before it is admitted; there is never any guarantee that the evidence will in fact lead to the feared prejudice.  That is why " 'prejudice' does not inhere in an item of evidence but rather consists of the jury's *expected* response."  22A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 5215 (2d ed. rev. 2021) (emphasis added).  By design, Rule 403 always entails some element of prediction.

In any event, the danger of unfair prejudice here is far *less* speculative than normal.  How often is there a peer-reviewed study that finds an overwhelming majority of Americans react negatively to the allegation the government hopes to lob against a defendant?  *See* Mot. 3 (discussing Michael Tomz & Jessica L.P. Weeks, *Public Opinion and Foreign Election Intervention*, 114 Am. Pol. Sci. Rev. 856 (2020)).  On top of hard data, there are rulings from this and other courts recognizing the grave "danger of unfair prejudice" inherent in allegations of foreign "influence in the U.S. Presidential Election."  Tr. of Pretrial Hr'g at 6, *United States v. Parnas*, No. 19-cr-725 (S.D.N.Y. Oct. 12, 2021), Dkt. 253; *see also* Tr. of Pretrial Hr'g at 5, *United States v. Manafort*, No. 17-cr-201 (D.D.C. Sept. 5, 2018), Dkt. 401 (agreeing "wholeheartedly" that "alleged collusion with the Russian government" was "unduly prejudicial").  Even the *government* has moved to exclude allegations of foreign interference in part because those allegations "could prejudice" a defendant.  Gov't Mot. in Limine at 17, *United States v. Stone*, No. 19-cr-18 (D.D.C. July 26, 2019), Dkt. 153.  In the face of all this—not to mention common sense— it takes an ostrich-like dedication to obliviousness to think that telling a D.C. jury that Mr. El-

Saadi aided a scheme by a foreign power to influence a presidential election poses no danger of unfair prejudice.

The government is just as wrong to think that a limiting instruction can cure the danger of unfair prejudice.  *See* Mot. 4-5 & n.3.  What would that instruction even look like?  The government wants to use the Nader–Khawaja scheme as "important context."  Gov't Resp. 1.  What are the permissible uses of amorphous context?  The government intends to argue that the "foreign nature of the funds drove the purpose of the conspiracy in Count Thirteen."  Gov't Resp. 6.  Hearing that, how could a juror follow an instruction not to consider the Nader–Khawaja allegations in deciding whether Mr. El-Saadi knowingly joined the conspiracy?  The government plans to tell the jury about the alleged foreign interference in its opening.  *See* Dkt. 158 at 18.  Will the Court give a limiting instruction during the government's opening?  The government says the Nader–Khawaja allegations are "inextricably intertwined" with the case against Mr. El-Saadi.  Gov't Resp. 4.  How, then, is a juror supposed to keep those allegations separate from the allegations against Mr. El-Saadi?  The government has no answers.

Instead, the government twists this Court's words to suggest that the Court has "already found" that a limiting instruction could undo the damage the Nader–Khawaja allegations will inflict at Mr. El-Saadi's trial.  Gov't Resp. 10.  In denying Mr. El-Saadi's first motion for severance, the Court noted that limiting instructions could limit the "risk of prejudice related to the first conspiracy's foreign ties."  Dkt. 128 at 28.  But at that point, the planned joint trial would *necessarily* involve the Nader–Khawaja allegations because "the two conspiracies [would be tried] together."  Dkt. 128 at 27.  The question now is different; it is whether evidence of the Nader–Khawaja scheme should be admitted at all in a trial against Mr. El-Saadi alone.  The Court has

6

never addressed that question. And as explained, the answer is that no limiting instruction can clear the minefield of prejudice the government wants to walk the jury through.

Beyond prejudice, the Nader–Khawaja allegations will sow confusion and mislead the jury. The indictment accuses Mr. El-Saadi of using money "funneled to him by KHAWAJA" to make a contribution to the Hillary Victory Fund. Dkt. 1 ¶58(g); *see* Dkt. 1 ¶¶67-68. It alleges that Mr. El-Saadi joined a conspiracy to "facilitate unlawful campaign contributions from KHAWAJA." Dkt. 1 ¶54. It says that Mr. El-Saadi's and the other contributions were "in reality . . . funded by KHAWAJA." Dkt. 1 ¶55. It claims Mr. El-Saadi and his alleged co-conspirators made those contributions "under their names as [Mr. Khawaja] directed." Dkt. 1 ¶57(a). It reiterates again and again that these were allegedly "KHAWAJA's political contributions." Dkt. 1 ¶57(d); *see* Dkt. 1 ¶¶55, 57(c). And it adds that Mr. Khawaja allegedly did all this because he had reached the applicable "contribution limits" and needed a way "to avoid and exceed the personal contribution limits set by federal law." Dkt. 1 ¶58(g).

Introducing the foreign-interference allegations scrambles everything. The government would ask the jury to convict Mr. El-Saadi of making a contribution in his name on Mr. Khawaja's behalf but tell the jury that the contribution really came from Mr. Nader even though Mr. El-Saadi didn't know that. The jury would see in the indictment that the alleged conspiracy was designed to evade "the personal contribution limits set by federal law," Dkt. 1 ¶58(g), but hear the government say that the "foreign nature of the funds drove the purpose of the conspiracy in Count Thirteen," Gov't Resp. 6. The government's planned presentation will either confuse the jury or trick the jury into thinking that where Mr. Khawaja got his money is important or that inadvertently using funds that once belonged to a foreign power is illegal. Either possibility is reason to exclude the Nader–Khawaja allegations under Rule 403.

7

If for no other reason, the Nader–Khawaja allegations should be excluded to avoid wasting the jury's time. To trace money from the UAE to Mr. Nader, to Mr. Khawaja's company, and then to Mr. Khawaja's personal accounts will take time. Each stop will require introducing exhibits and eliciting testimony. Whatever time that takes, double it for the time Mr. El-Saadi's counsel will need to defuse such prejudicial "evidence" on cross-examination. Opening the door to the Nader–Khawaja allegations will also force Mr. El-Saadi's counsel to pursue lines of cross-examination that would not otherwise be necessary and that are bound to draw objections from the government. Then there are all the delays for the futile limiting instructions that Mr. El-Saadi's counsel would have to insist on to create a clean record. That still does not count the vastly extended voir dire that injecting Mr. Nader and allegations of foreign interference will require. There are so many prejudicial landmines that a busted venire panel is a real possibility if the Nader–Khawaja allegations are fair game. To avoid that time sink, the Court may need to call more prospective jurors during a pandemic. All so the government can introduce wildly prejudicial background evidence of a scheme Mr. El-Saadi knew nothing about.

\*   \*   \*

Allowing the government to whip up jurors' understandable outrage at allegations of foreign interference in a U.S. presidential election and then direct that outrage toward Mr. El-Saadi—the only defendant on trial—who knew nothing about it needlessly gambles with Mr. El-Saadi's right to a fair trial. That is a gamble with no upside. The Nader–Khawaja allegations are more likely to confuse or mislead than assist the jury. And even if those dangers do not materialize, there is no cause to waste the jury's time with barely relevant allegations. For any and all of those reasons, the Nader–Khawaja allegations should be off limits at Mr. El-Saadi's trial.

## II. THE GOVERNMENT SHOULD BE PRECLUDED FROM ARGUING IN ITS OPENING STATEMENT THAT MR. EL-SAADI FABRICATED ANY DOCUMENTS

In its response, the government clarifies that it intends to argue that Mr. El-Saadi allegedly fabricated the $150,000 invoice in August 2016 rather than years later to obstruct an investigation. *See* Gov't Resp. 12-14. Given that clarification, counsel's duty of candor requires conceding that the government's intended argument likely qualifies as "intrinsic" under existing precedent and is thus beyond Rule 404(b)'s scope. Nevertheless, to preserve his objection should the government seek to admit unnoticed bad-act evidence, Mr. El-Saadi respectfully declines to withdraw his motion to exclude unnoticed Rule 404(b) evidence.

Though existing precedent allows the government to outline its planned argument during its case in chief, that argument has no place in the government's opening statement. A "prosecutor's opening statement should be an ***objective*** summary" of the evidence. *United States v. Moore*, 651 F.3d 30, 51 (D.C. Cir. 2011) (per curiam) (quotation omitted; emphasis added). "[I]t is not an occasion for argument." *United States v. Dinitz*, 424 U.S. 600, 612 (1976) (Burger, C.J., concurring). There is no evidence that the invoice was fabricated; there is only the government's raw belief. It would therefore exceed the proper scope of an opening statement for the government to tell the jury that Mr. El-Saadi fabricated the invoice. To avoid disrupting the government's presentation, Mr. El-Saadi asks that the Court rule now that the government may not argue in its opening statement that Mr. El-Saadi fabricated the invoice or any other document.

Regrettably, Mr. El-Saadi must also address the unfounded accusations against him in footnote three of the government's response. Out of nowhere, the government implies that Mr. El-Saadi tampered with a potential witness by encouraging the witness to travel abroad to avoid a

9

trial subpoena.[4]  That allegation is false.  It is reckless.  And it violates basic precepts of civility in the legal profession.  For the U.S. government to heave such serious—and false—accusations without a whiff of support is unacceptable.

### III. THE GOVERNMENT SHOULD BE PROHIBITED FROM ELICITING TESTIMONY REQUIRING SPECIALIZED KNOWLEDGE

Rule 701 prohibits lay testimony based on "specialized knowledge" unfamiliar to the average person.  That testimony must come from a qualified and properly noticed expert under Rule 702.  Per the D.C. Circuit, "knowledge derived from previous professional experience falls squarely 'within the scope of Rule 702'" as specialized knowledge.  *United States v. Smith*, 640 F.3d 358, 365 (D.C. Cir. 2011) (Kavanaugh, J.) (quoting Fed. R. Evid. 701(c)).  Testimony by an FBI agent regarding "drug dealers' slang," for example, is "not admissible under Rule 701 as lay testimony" where it is "based on 'specialized knowledge' [the agent] gained from working on other drug investigations."  *Id.*  "A witness with firsthand experience of a particular drug operation," by contrast, may generally "testify under Rule 701" regarding that specific operation.  *United States v. Wilson*, 605 F.3d 985, 1025 (D.C. Cir. 2010) (per curiam).  But even where a witness has knowledge specific to the case at hand, the witness must articulate the precise bases for the testimony so that the jury may evaluate the witness's claims; general references to "knowledge of the investigation" or "review of unspecified" evidence in the case are not enough.  *United States v. Williams*, 827 F.3d 1134, 1158 (D.C. Cir. 2016) (per curiam).  Where it is unclear whether a lay witness's "testimony was based upon his experience" or "his own perceptions of events presented to the jury," the risk that jurors might give lay testimony "an aura of special

---

[4] The government's accusation is even more puzzling given that the government had **years** to interview the potential witness but never did so.

reliability and trustworthiness" in deference to nonspecific "experience" is too much for Rule 701 to bear. *Id.* at 1160-61 (quotation omitted).

The testimony the government hopes to elicit from Mr. Hartsock, a low-level FEC employee, is specialized knowledge.[5] Not an ounce of the anticipated testimony comes from Mr. Hartsock's "perceptions of events presented to the jury." *Williams*, 827 F.3d at 1160. It all flows from his supposed "knowledge and understanding of the FEC's functions"—untethered to this case. Gov't Resp. 19. That knowledge is not within the average juror's ken. It is entirely "derived from previous professional experience," which the D.C. Circuit says "falls squarely 'within the scope of Rule 702.'" *Smith*, 640 F.3d at 365 (quoting Fed. R. Evid. 701(c)). Compounding the problems, Mr. Hartsock's testimony lacks any grounding in "specific observations and inferences" that Mr. Hartsock can articulate for the jury to evaluate. *Williams*, 827 F.3d at 1160. Under binding D.C. Circuit precedent, Mr. Hartsock's planned testimony is inadmissible.

The government offers nothing but misdirection in its response. It is no answer to say that Mr. Hartsock's knowledge is "based on first-hand experience" at the FEC. Gov't Resp. 19. ***All*** specialized knowledge comes from the witness's personal training and experience; without that personal knowledge, the witness wouldn't be an expert. More troubling for the government's argument, however, is that the government utterly fails to address the binding D.C. Circuit

---

[5] Given Mr. Hartsock's position at least five layers down from the FEC commissioners, he is unqualified to speak on what "matters" or is "important" to the FEC as an entity. *See FEC Offices*, Fed. Election Comm'n (Dec. 31, 2021), https://www.fec.gov/about/leadership-and-structure/fec-offices/ (showing Alec Palmer as the Staff Director reporting to "The Commissioners"; Kate Higginbothom below Mr. Palmer; and Patricia C. Orrock beneath Ms. Higginbothom); *Office of the Deputy Staff Director/Chief Compliance Officer*, Fed. Election Comm'n (Dec. 31, 2021), https://transition.fec.gov/about/offices/CCO/CCO.shtml (showing the Reports Analysis Division beneath Ms. Orrock); *Reports Analysis Division*, Fed. Election Comm'n (Dec. 31, 2021), https://transition.fec.gov/about/offices/rad/rad.shtml (showing Deborah Chacona as head of the Reports Analysis Division and—finally—Mr. Hartsock as a member of Ms. Chacona's staff).

11

precedent teaching that "knowledge derived from previous professional experience falls squarely 'within the scope of Rule 702.'" *Smith*, 640 F.3d at 365 (quoting Fed. R. Evid. 701(c)). Instead, the government trots out two distinguishable, nonbinding opinions. Take *United States v. Robinson*, No. 16-cr-98, 2017 WL 11496737 (D.D.C. July 13, 2017) (cited at Gov't Resp. 20). The pharmacist witnesses there were real fact witnesses who had "refused to fill prescriptions for oxycodone issued by the Defendant." *Id.* at *1. The district court allowed the "pharmacists to testify as to th[at] fact" and to explain "their reasons for doing so." *Id.* That testimony had a proper grounding in "specific observations" tied directly to case-specific facts before the jury. *Williams*, 827 F.3d at 1160. The same is true of the testimony in *Atlanta Channel, Inc. v. Solomon*, No. 15-cv-1823, 2021 WL 4243383 (D.D.C. Sept. 17, 2021) (cited at Gov't Resp. 20). *See id.* at *2-4. In both cases, the "professional experience" came into play only because it shaped the witnesses' perception of the case-specific facts they observed. That is not true of Mr. Hartsock's anticipated testimony. He is, after all, the government equivalent of a hired gun; he gives the same testimony in campaign finance cases—but never it seems in the D.C. Circuit—regardless of the facts at issue.[6] To allow a near-professional witness with no case-specific knowledge who plans to testify on matters beyond jurors' everyday experience based on his unspecified "professional experience" would violate D.C. Circuit precedent three times over.

## **CONCLUSION**

"The prosecution—which has available to it the immense resources of the federal government—possesses a significant advantage in criminal cases, and there seldom is a good

---

[6] *See, e.g.*, Trial Tr. at 446, *United States v. Parnas*, No. 19-cr-725 (S.D.N.Y. Oct. 14, 2021), Dkt. 257; Trial Tr. at 4, *United States v. Lundergan*, No. 5:18-cr-106 (E.D. Ky. Aug. 15, 2019), Dkt. 215; Trial Tr. at 540, *United States v. Benton*, No. 4:15-cr-103 (S.D. Iowa Apr. 28, 2016), Dkt. 695.

reason for a prosecutor to push the envelope of that advantage." *Kilmartin*, 944 F.3d at 337.  The government wants to do more than push the envelope here.  It wants to ride prejudicial allegations with next to no probative value to a conviction; it wants to further taint the trial with improper argument about a dreamed-up fabricated invoice; and it wants to gloss it all with the shine of respectability that comes with expert testimony but without the inconvenience of noticing an expert.  Mr. El-Saadi respectfully requests that the Court grant his omnibus motion in limine in its entirety to ensure that none of that happens.

Dated:  December 31, 2021
        Washington, D.C.

Respectfully submitted,

/s/ Justin V. Shur
Justin V. Shur
D.C. Bar #973855
Kenneth E. Notter III
D.C. Bar #1708367
MOLOLAMKEN LLP
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
Telephone: (202) 556-2000
Facsimile:  (202) 556-2001
jshur@mololamken.com

Megan Cunniff Church
Admitted *pro hac vice*
IL Bar #6281234
MOLOLAMKEN LLP
300 N. LaSalle Street
Suite 5350
Chicago, IL  60654
Telephone: (312) 450-6700
Facsimile:  (312) 450-6701

*Attorneys for Rani El-Saadi*

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of December 2021, I electronically caused to be filed Rani El-Saadi's Reply in Support of His Omnibus Motion in Limine using the CM/ECF system, which will send a notification of such filing to all counsel of record.

/s/ Justin V. Shur
Justin V. Shur
D.C. Bar # 490545
MOLOLAMKEN LLP
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
Telephone: (202) 556-2000
Facsimile: (202) 556-2001
jshur@mololamken.com